HENRY RIPPE *vs.* GEORGE L. BECKER *et al.*

Argued Dec. 6, 1893.   Reversed Jan. 5, 1894.

No. 8572.

**Building grain elevator and carrying on grain business are not the regulation of that business.**

Laws 1893, ch. 30, entitled "An act to provide for the purchase of a site and for the erection of a state elevator or warehouse at Duluth for public storage of grain," etc., is not an exercise of the police power of the state to regulate the business of receiving, weighing, and inspecting grain in elevators.   It has no relation to the regulation of the business, but provides for the state itself engaging in carrying it on.

**To so build and carry on, is not the exercise of the police power.**

The police power of the state to regulate a business is to be exercised by the adoption of rules and regulations as to the manner in which it shall be conducted by others, and not by itself engaging in it.

**But is a work of internal improvement and prohibited.**

The act in question is in violation of the Constitution, Art. 9, § 5, providing that "the state shall never contract any debts for works of internal improvement or be a party in carrying on such works."

**Internal improvements defined.**

"Works of internal improvement," as used in the Constitution, means, not merely the construction or improvement of channels of trade and commerce, but any kind of public works, except those used by and for the state in the performance of its governmental functions, such as a State Capitol, State University, Penitentiaries, Reformatories, Asylums, Quarantine Buildings, and the like, for the purposes of education, the prevention of crime, charity, the preservation of public health, furnishing accommodations for the transaction of public business by state officers, and other like recognized functions of state government.

Appeal by plaintiff, Henry Rippe, from an order of the District Court of Ramsey County, *John W. Willis*, J., made September 25, 1893, sustaining a demurrer to his complaint.

The plaintiff was a citizen freeholder and tax payer of this state and commenced this action August 8, 1893, on behalf of himself and all other citizens similarly situated, against George L. Becker, William M. Liggett, Ira B. Mills, Railroad and Warehouse Commissioners, and Adolph Biermann, State Auditor, as defendants, to restrain them from entering into any contract for the construction of a grain elevator under Laws 1893, ch. 30, and to have that act adjudged unconstitutional and void. The plaintiff stated among other things that he was, and for several years had been, engaged in the business of buying, shipping, storing and selling wheat and other grain and had paid large fees for its inspection under Laws 1885, ch. 144, and that the State had on hand in the treasury $69,527.94, collected of him and other dealers in excess of the expenses and salaries paid under the act. That the Commissioners had bought a lot on the Bay of St. Louis in Duluth and paid $11,000 therefor out of that fund and had made plans and specifications for a grain elevator to be built thereon and had advertised for and secured bids for building it, and were about to contract for its construction

at a cost of $198,700. That the State would thereby contract a debt for, and engage in carrying on, a work of internal improvement and the public money would be unlawfully expended.

The defendants demurred to the complaint and specified as ground of objection that it did not state facts sufficient to constitute a cause of action. On argument the demurrer was sustained, September 25, 1893, the Court saying:

"Laws 1885, ch. 144, providing for the inspection, weighing and grading of grain was one of great beneficence. It was enacted in response to a complaint from a large body of our citizens, that the ordinary methods of grading, weighing and shipping grain had caused them great injustice—great loss. It was to remedy an evil which the Legislature found to exist, that Laws 1893, ch. 30, was enacted.

It is entirely proper for the State, through the exercise of police power, to establish elevators; not for the purpose of engaging in the business of storing grain, but as incidental to the inspection which is generally given to grain while it is in process of delivery to an elevator or while it is stored in an elevator, or while it is in process of shipment from an elevator or warehouse.

An elevator, such as is described in the act of 1893, is an appropriate instrumentality, a practical and efficient agency, in the hands of the State for the inspection of grain. In the exercise of its police powers, the State has the same right to erect an elevator or warehouse that it would have to erect a building to serve as an office for a grain inspector, the same right it would have to erect a building in which to keep the weights and measures used in connection with the inspection of grain. The elevator so erected is not to be considered as a public improvement in any other sense than any structure is to be so considered which is necessary and material for the execution of some of the great functions of government.

The proposition that the operation of the act of 1885 has, by reason of the excessive fees charged for the inspection of grain, created a revenue which practically makes that act operate as a revenue act and not as an inspection act, and that such course and tendency are emphasized by the act of 1893, is overruled. The fees are not shown to be excessive, because although a large sum

has been realized over and above the necessary expenses which have been hitherto incurred in the inspection of grain, *non constat* that it was not the intention of the Legislature to use more expensive agencies and appliances in and about the inspection of grain; and it was entirely proper for the Legislature to make the fees so large as to cover all the present and contemplated expenditures for the purposes indicated.

The proposition that the enforcement and execution of the act of 1893 will create a debt against the State is negatived and overruled. The act, so far as it may be held to require payment for the construction of the elevator, requires payment in cash. It does not authorize the issuance of any bond or certificate of indebtedness. It does not require or authorize the Board of Railway and Warehouse Commissioners to make any promise to pay for the construction of the elevator at any date future to the date upon which the elevator is to be completed. An appropriation by language in the present tense is made, which, according to the terms of the act, is to cover the entire cost of the construction of the elevator. The money so appropriated is to be taken from a certain fund described in the act. It appears from the complaint, and is conceded on demurrer, that the fund at the present time does not amount to a sufficient sum to cover this appropriation, and that it will not by the first day of October, A. D. 1894. There is no presumption that the State intends to be in default at that time. There is no presumption that the discharge of a public duty will be left by the present legislature to any succeeding legislature. Regarding the State as an individual, an entity, it must be within the intention of the State to provide by the hands of the present legislature means to defray the entire cost of constructing this elevator, and the presumption is that the present legislature will again convene and will make the necessary appropriations and supply the necessary funds for the purpose.

Even though the entire cost of the elevator should not be paid prior to the 1st day of October, A. D. 1894, but by the terms of the contract the contractor should take this appropriation of money in instalments, from time to time, as the grain-and-warehouse-inspection fund admitted, that would not, in any proper sense of the word, constitute an indebtedness upon the part of the State. The

indebtedness referred to in the Constitution is evidently that which is contracted by the issuance of bonds or certificates of indebtedness, and not those temporary debts which occur from time to time in the execution of objects of great public importance. The past and contemporary usage of the State, from the inauguration of the state government to the present time, enforces these views. As soon as a contract is let for the erection of a state penitentiary or state insane asylum, an indebtedness stretching into future years is at once created. It has never been held that such an act on the part of a state government was the incurring of a debt prohibited by the constitution.

This elevator is not such an internal improvement as is mentioned in the constitution of the state and which the state by that instrument is inhibited from executing. This elevator corresponds rather with structures such as have been erected for the state university, the state normal schools and hospitals for the insane. The term "internal improvements" received a fixed construction through a long course of debate in the congress of the Federal government and in the dissertations of statesmen and publicists, long before the state government of Minnesota was organized. That term must, in my opinion, be held to refer only to the construction and improvement of avenues for commerce and travel.

It has been said by many writers upon constitutional law that it will always be with hesitation that any act of the Federal congress or of a state legislature will be held to be unconstitutional. That hesitancy attends upon my ruling now. The state legislature is one of the co-ordinate branches of the state government, but, in many respects, it is the most important branch of that government. It originates all the measures through which the public life is maintained, through which the will of the people is made known, through which that will is impressed upon present time and exerts its influence upon future generations.

The policy of the act under consideration is not for the courts, in any sense of the word, to determine. The policy of legislation is a matter exclusively for the determination of the state legislature.

In my opinion the complaint states no cause of action against any of the defendants named in the complaint. The act of 1893

imposes no restrictions upon the plaintiff. It does not curtail his liberty, he does not suffer from prospective unjust competition since he is neither the owner nor the manager of an elevator.

The complaint, *prima facie*, seems to show that the railway and warehouse commission will, in its total expenditures under the act of 1893, exceed the limit of the appropriation of $200,000. Conceding this proposition, an administrative error, a mere abuse of authority is shown which would not entitle the complainant in this action to an injunction, under the rules of equity. The demurrer is sustained."

*Wilson & Van Derlip*, for appellant.

The plaintiff denies the right and power of the Legislature to engage the State in the elevator business, or any other business, and to impose upon him and others similarly situated, the burden of constructing such elevator for its use. If it may do this, it can, after the elevator is constructed, by the exercise of the same power, impose upon that class in the community which is engaged in purchasing and exporting the wheat crop of this and adjoining states, the burthen of constructing an independent railway line into the great wheat fields of the State, to be under the management and control of the State; or, the burthen of equipping a line of freight boats to carry the product of this and other States to the Buffalo or Liverpool market. Such a work, when directed, planned and executed by the State, is a State work. It is a public improvement made by the State, for the use of the people of the State upon equal terms. After it is constructed, it is to be operated and carried on by the agents of the State, under such regulations as may be adopted or directed by the State. Constitution, Art. 9, § 5. *Clark* v. *Janesville*, 10 Wis. 136; *State ex rel.* v. *Farwell*, 3 Pinney 393; *Sloan* v. *State*, 51 Wis. 623; *Anderson* v. *Hill*, 54 Mich. 477; *Bay City* v. *State Treasurer*, 23 Mich. 499; *Sparrow* v. *Land Commissioner*, 56 Mich. 567.

It is claimed that the term "internal improvement" in the constitution refers only to the construction and improvement of avenues of commerce and travel.

It is admitted that no case can be found in which it has been held that a public elevator constructed by the State is an internal improvement. Minnesota is the pioneer in the elevator business.

It is claimed in this action that the State may contract debts for works of internal improvement, and be a party to carrying on the same, in the exercise of its police power, to regulate a lawful business. This is the exception contended for by the Attorney General, and the ground upon which the Court below founded its decision. But this is not the view taken by the Courts. *Leavenworth County* v. *Miller*, 7 Kans. 493; *Sparrow* v. *Land Commissioner*, 56 Mich. 567; *Traver* v. *Merrick County Com'rs*, 14 Neb. 327; *Township of Burlington* v. *Beasley*, 94 U. S. 310; *Blair* v. *Cuming County*, 111 U. S. 363.

The act authorizes the contracting of a public debt in violation of the Constitution. Art. 9, §§ 5, 6, 7, 9, 10.

The Commissioners are simply the agents of the State to execute the contract to build the elevator, and, when made, it will be the contract and obligation of the State, because authorized and directed by the State, and the contract price will be a debt of the State. *Newell* v. *The People*, 7 N. Y. 9; *State* v. *Medberry*, 7 Ohio St. 522; *Hubbard* v. *Township Board*, 25 Mich. 153; *State* v. *Mills*, 55 Wis. 229.

*H. W. Childs*, Attorney General, and *Geo. B. Edgerton*, his assistant, for the State.

Properly viewed, Laws 1893, ch. 30, is an effort on the part of the State to secure to that great part of the public whose interests are involved, more ample protection. There surely is no distinction in principle between the act of the State, when it invades, with its inspection forces, the private elevators of its citizens and there carries on its work, and when it rears for itself a suitable building wherein the work may be performed. If the inspection of grain is a just exercise of the police power, and it is now too late to question it, it would seem that the State is in no way restricted or limited in the adoption of suitable instrumentalities. The building in question must be held to be an incident to that work.

The act does not provide for an internal improvement within the meaning of Constitution, Art. 9, § 5. The terms, as there used, must be restricted to the establishment of highways as agencies of travel and commerce, like railroads and canals, to the improvement of rivers and waterways, the erection of bridges, and whatever else

tends to facilitate commercial intercourse. *Mayor of Wetumpka* v. *Newton,* 23 Ala. 660; *Union Pac. R. Co.* v. *Commissioners,* 4 Neb. 450; *Bushnell* v. *Beloit,* 10 Wis. 167; *Sloan* v. *State,* 51 Wis. 623; *Ryerson* v. *Utley,* 16 Mich. 269; *Hubbard* v. *Township Board,* 25 Mich. 153; *Anderson* v. *Hill,* 54 Mich. 477; *Bay City* v. *State Treasurer,* 23 Mich. 499; *Sparrow* v. *Commission,* 56 Mich. 567; *Wilcox* v. *Paddock,* 65 Mich. 23; *Gillinwater* v. *Mississippi, &c., R. Co.,* 13 Ill. 1.

The act does not authorize the Commissioners to contract a public debt. It is only an ordinary appropriation of money. The State's money is its own; it can give it or not, as it pleases. *Dike* v. *State,* 38 Minn. 366.

What is there in the law that offends against the Constitution in this respect? How is the credit of the State pledged, or to be pledged? The Legislature has prescribed within constitutional bounds what may be done by the Commission. It has placed at its disposal a ready sum of money and authorized it to use for the same purpose, such other sums as may come into the grain and warehouse fund. Every contract made by that body must be drawn with reference to the powers so conferred; and into every contract made by it, the Courts will read the provisions of the Law of 1893. Whoever shall enter into a contract with that body, to construct the warehouse must await the collection of fees into that fund, whether early or late, before realizing the full contract price. *State* v. *McCauley,* 15 Cal. 429.

MITCHELL, J. The object of this action, briefly stated, was to restrain the Board of Railway and Warehouse Commissioners from building a State Elevator at Duluth pursuant to the provisions of Laws 1893, ch. 30.

The plaintiff assails the constitutionality of this act on several grounds; but the only one we find necessary to consider is that it is in violation of the Constitution, Art. 9, § 5, of this State, which provides that "the state shall never contract any debts for works of internal improvement or be a party in carrying on such works."

On the other hand, the contentions of the defendant are:

*First.* That the works contemplated by the act are merely ancillary

to the more effectual exercise by the state of its police power to regulate the weighing and inspection of grain stored in bulk, and to regulate the charges for handling and storing the same in elevators or warehouses.

*Second.* That the elevator and other works provided for in the act are not "works of internal improvement," within the meaning of the Constitution; that this term refers only to channels of travel and commerce, such as roads, bridges, railways, canals, rivers, and the like. We shall consider these two propositions in the order named.

The right of the state, in the exercise of its police power, to regulate the business of receiving, weighing, inspecting, and storing grain for others, in elevators or warehouses, as being a business affected with a public interest, is now settled beyond all controversy. This power extends even to fixing the charges for such services. *Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517, (12 Sup. Ct. 468.)

And where a business is a proper subject of police regulation, doubtless, the legislature may, in the exercise of that power, adopt any measures they see fit, provided only they adopt such as have some relation to, and have some tendency to accomplish, the desired end; and if the measures adopted have such relation or tendency the courts will never assume to determine whether they are wise, or the best that might have been adopted. *State* v. *Donaldson*, 41 Minn. 74, (42 N. W. 781.)

How the "grain elevator" business may be and has been regulated is illustrated by the statutes of this state enacted for that purpose, notably Laws 1885, ch. 144, and Laws 1893, ch. 28. The first of these statutes declares all elevators or warehouses at certain terminal points, in which grain is stored in bulk, public warehouses. Requires the proprietor or manager to obtain a license and give a bond; to receive for storage all grain in suitable condition when tendered. Prohibits him from mixing grain of different grades. Requires him to keep grain in separate bins when requested by the owner. Provides what kind and form of receipt he shall give for the grain. Prohibits him from inserting anything in the receipt limiting his liability as imposed by the laws of the state. Requires him to make statements under oath of the condition of his business whenever required by the Board of Railway and Warehouse Commissioners; also, to

post weekly statements of the amount of each kind and grade of grain in store in his warehouse, and to furnish certain statements to the warehouse register; also, to publish a schedule of rates of charges for storage, etc. Provides minutely what he shall do when any of the grain in store becomes damaged or out of condition; also, that all persons interested, and all authorized inspectors, shall have the right at any time to examine the grain in store; that all scales shall be subject to examination and test. Requires the Railroad and Warehouse Commission to appoint a weighmaster and necessary assistants; also, an inspector of grain, (who may appoint deputies,) who shall have the supervision and exclusive control of the weighing and inspection of grain, subject to such rules and regulations as the Board may adopt. Requires the Board to fix the fees for weighing and inspecting; also, to establish the grades of grain, and publish the same; and, generally, to exercise control and supervision over the handling, inspection, weighing, and storage of grain, and to establish all necessary rules and regulations for the same. In contrast with this, we turn to the act of 1893, ch. 30, now under consideration. Its title is, "An act to provide for the purchase of a site and for the erection of a state elevator or warehouse at Duluth in this state for public storage of grain, and the regulation thereof, to publish a market report, and to appropriate money for that purpose." It orders the establishment of a warehouse and elevator, of a total capacity of 1,500,000 bushels of grain, to be located on Duluth harbor, on St. Louis bay, where there is navigable water, or where docks can be established for the largest vessels in the carrying trade on Lake Superior, and on such point as shall offer terminal facilities with the various railroads centering at the head of Lake Superior; that "said institution" shall be under the control and management of the Board of Railway and Warehouse Commissioners, who are required to locate the same, procure the necessary site, and erect the necessary buildings thereon, with the proper equipments and facilities to carry the act into effect, and build or procure "all necessary spur tracks, terminal yards and other facilities to receive and ship grain." The elevator is to have facilities for "weighing, unloading, cleaning and safe keeping of grain in separate bins; also for placing grain of the same grade together." The act provides for the commissioners procuring plans and specifications for elevator, adver-

tising for bids, and letting the contract for its construction to the lowest and best bidder; and provides for the manner of payment for the site and the construction of the building; and appropriates $200,000 for that purpose out of any moneys in the state treasury belonging to the "grain and warehouse fund," to and with which the grain inspection fund, under the act of 1885, is transferred and consolidated.

The elevator is to be under the management of the Board of Railway and Warehouse Commissioners, who are to appoint a suitable person as warehouseman "of said state elevator or warehouse," and such assistants as are necessary, and adopt such rules and regulations for the receiving, handling, storing, and delivering grain as they shall deem proper, with power, in case they think that any person or combination of persons is seeking "to monopolize said elevator," to adopt rules limiting the amount of grain which any one person, combination, or corporation may have in the elevator at any one time. They are also required to fix the charges for storing, inspecting, weighing, and handling grain, including the cost of receiving and delivering, which charges are to be a lien on the grain so received, and, when collected, to be paid into the state treasury to the credit of the grain and warehouse fund.

The elevator is to be "cleaned and measured up" once each year, to ascertain whether there is any gain or loss by the system of dockage.

In connection with their other duties in managing and operating this elevator, the Commissioners are to keep on file, for public inspection, publications showing the market price of grain and farm products in certain specified leading markets of this country and Europe; also, the freight rates to such markets by the different means of transportation; also, to publish a weekly bulletin showing the prices paid in said markets for farm products, and the rates of freight between Duluth and Minneapolis and said markets, said bulletin to be kept on file "in said institution," and in the office of the Commissioners in St. Paul, and also to be furnished by mail to all persons who may order the same, at a price to be fixed by the Commissioners, not exceeding one dollar per annum.

The Commissioners are also to send samples of grain, being exported, to the various leading markets of the world, "for inspection

and to secure prices as to their market value, that they may know whether the markets of Minnesota are within a reasonable difference in price of the markets of the world. Said Commission shall have power to purchase and export a quantity of grain to any of said markets, if they deem such course advisable, in order to ascertain the facts in the case; it being the intention of this act to prevent monopolization and unjust control of the markets of the state for farm products."

It seems to us as plain as words can make it—too plain to admit of argument—that the provisions of this act have no relation or reference whatever to the exercise of the police power to regulate the "grain elevator" business. We cannot discover, and counsel have failed to point out, a single provision of the act that has any relation to, or any tendency to accomplish, any such purpose. Aside from the provisions of sections 3 and 4, for what we may term a bureau of information as to the state of the markets and rates of transportation, (which has no relation to the exercise of any police power, and the connection between which and an elevator of a capacity of 1,500,000 bushels, with "all necessary spur tracks, terminal yards and other facilities to receive and ship grain," is not apparent,) the evident sole purpose of the act is to provide for the state erecting an elevator, and itself going into the "grain elevator" business. All the provisions of the act as to receiving, handling, storing, and delivering grain clearly have reference only to the management of the business conducted by the state in its own elevator. The keynote to the object of the law is, we apprehend, to be found in the last clause of section 4 above quoted as to the intention of the act; and so far as relates to the right of the state, under the police power, to regulate this business, the position of defendants' counsel really amounts to this: That whenever those who are engaged in any business which is affected with a public interest, and hence the subject of governmental regulation, do not furnish the public proper and reasonable service, the state may, as a means of regulating the business, itself engage in it, and furnish the public better service at reasonable rates, or, by means of such state competition, compel others to do so.

The very statement of the proposition is sufficient to show to what startling results it necessarily leads. It needs no argument to

prove that if, in the exercise of the police power to regulate this business, the state itself has a right to erect and operate one elevator at Duluth, it has the power to erect and operate twenty, if necessary, at the same point, and also to erect and operate elevators at every point in the state where there is grain to be handled and stored.

Railways are also, under this same police power, the subjects of state regulation; and if it should be deemed that they were not furnishing the public with proper service, or charging unreasonable rates, it could with equal propriety be claimed that it would be a proper means of exercising the police power of regulating the business for the state itself to construct and operate competing railways. The hack business, the pawnbrokers' business, the manufacture and sale of intoxicating liquors, and numerous other kinds of business that might be named, are also the subjects of state regulation; and, if counsel's contention is correct, we do not see why, as a means of "regulating" these kinds of business, the state itself might not engage in running hacks, pawnbrokers' shops, building and operating distilleries and breweries, or even running saloons. But further illustration cannot be necessary. The police power of the state to regulate a business does not include the power to engage in carrying it on. Police regulation is to be affected by restraints upon a business, and the adoption of rules and regulations as to the manner in which it shall be conducted.

While the jurists of continental Europe sometimes include under the term "police power" all governmental institutions which are established with public funds for the promotion of the public good, yet, as understood in American constitutional law, the term means simply the power of the state to impose those restraints upon private rights which are necessary for the general welfare of all, and is but the power to enforce the maxim, "*Sic utere tuo ut alienum non laedas.*"

The provisions of this act have no reference to the regulation, in any such sense, of the "grain elevator business," and the right of the state to embark in the construction and operation of these works cannot be predicated on the police power.

2. Irrespective of the police power, we may concede, without deciding, that the legislature has unlimited power to embark, at the expense and in behalf of the state, in any business or other enterprise

it sees fit, which is not prohibited by the constitution. It remains, therefore, to consider whether the elevator and other works contemplated by this act are works of internal improvement, within the meaning of the constitution.

As already stated, defendants' contention is that the prohibition of the Constitution must be restricted to channels of travel and commerce. There is certainly nothing in the etymology of the words that would thus limit their meaning. "Internal" means merely interior, or within any limit; and "improvement" means progress towards what is better, or melioration. But, of course, etymological definitions of words are not controlling, if a phrase has, by common usage and understanding, received a fixed and definite meaning. And, in support of his contention counsel appeals to what he claims has become the fixed historical meaning of "internal improvements" in the political dialect of this country. The history of the term, as well as of the causes which led to the adoption of provisions in the constitutions of many states prohibiting the state from engaging in works of internal improvement, has been gone into very exhaustively by counsel in their brief. It is unquestionably true that in the earlier history of this country the works of "internal improvement" or "public improvements" (the terms seem to have been used interchangeably, as synonymous) in which the government, federal or state, embarked, were channels of travel and commerce, such as the construction of turnpikes and canals, and the improvement of rivers and harbors. There were two reasons for this: First, in the then undeveloped condition of our country, highways for travel and commerce were the great and urgent need of the people; second, in those days the tendency was, much more than now, to limit the functions of government to those things which were necessary to secure the enjoyment of life, liberty, and property. Channels of travel and commerce were of such public importance as to be deemed by many to come within that category; but beyond that it was not supposed that it was proper or competent for the state to embark in any public improvements, except such as strictly pertained to its proper governmental functions. Hence, in the controversy between the two great national parties during the last thirty years of the first half of the present century, the phrase "internal improvements" was generally, if not always, used with reference to the building of turn-

v.56m.—8

pikes and canals, (and latterly railroads,) and the improvement of rivers and harbors, because those were the only works, public and internal in their nature, in which it was proposed that the federal government should embark.

The same was true of the state governments. The construction of roads, canals, and the like, were the only works of internal or public improvement, outside those required in the performance of strictly governmental functions, in which they engaged.

But, suffering as the people were for want of channels of travel and commerce, which seemed the great *desideratum* for the development of the country, many of the states, for a time, expended large sums of money, and incurred immense debts, in the construction of roads and canals, some of which were of much value, and others of very little value, the cost and management of which, in many cases, resulted in financial disaster, bankruptcy, and even state repudiation. This was notably true in the great financial crash of 1836–37.

Experience demonstrated that such enterprises could not be economically constructed or profitably and prudently administered by the government; and hence many of the states not only made provision for disposing of their works of public improvement, but, in view of their bitter experience, inserted in their constitutions provisions prohibiting the state from ever again engaging in such undertakings. The purpose, clearly, was to remand all such works to private enterprise, and to protect the citizen from being taxed for them. These provisions were incorporated by the people in their constitutions as precautions against injudicious action by their legislatures or even themselves, if, in a time of inflation or popular excitement, they should be tempted to embark in public improvements in cases where they were not content to wait the result of private enterprise. This state had an experience of this kind at an early day, in the adoption of the $5,000,000 loan bill, in the form of a constitutional amendment. The result of that experiment is a matter of familiar history.

In the case of the states, as in the case of the federal government, it is no doubt true that what was prominently in mind in using the term "works of internal improvement," or "public improvement," were roads, canals, rivers, and other avenues of commerce, and that

it was the evils resulting from the states embarking in that class of improvements which chiefly led to the adoption of these constitutional prohibitions. As already suggested, the reason was that this was the only class of public works in which the states, up to that time, had engaged. No case, we admit, can be found, in which it has been held that a grain elevator is a work of internal improvement; for, so far as we can discover, Minnesota is the pioneer state in attempting to embark in any such enterprise.

But it is equally true that no case can be found in which it has been held that works of internal improvement mean only channels or mediums of travel and commerce. Indeed, even if the term was to be given the restricted meaning contended for, it is not apparent why it would not still include the works contemplated by this act; for an elevator on the navigable waters of a great lake, with terminal connections with all the railways centering at that point, and equipped with "all necessary spur tracks, terminal yards and other facilities to receive and ship grain," is merely ancillary to the transportation of the property. In fact, the receipt and storage of the grain into, and its delivery out of, such an elevator, is but a part of its transportation.

But we reject any such narrow definition of the term "works of internal improvement," and we are not without authority for our position.

An act of the legislature of Nebraska authorized the issue of bonds by any county to aid in the construction of any railroad or other work of internal improvement.

There was some ground, here, to hold, upon the application of the doctrine of *ejusdem generis*, that the act applied only to works similar in kind to railroads. But in *Traver* v. *Merrick Co.*, 14 Neb. 327, (15 N. W. 690,) it was held that a water grist mill erected for public use, the rates of toll to be regulated by the county commissioners, and being subject to regulation by the legislature, was a work of internal improvement, within the meaning of the act; the court saying that the test for determining the character of an improvement of this kind is the use for which it is designed. If it is for public use, subject to legislative control and regulation, it would seem to come within the meaning of the words "internal improvement."

In *Blair* v. *Cuming Co.*, 111 U. S. 363, (4 Sup. Ct. 449,) the Supreme

Court of the United States, in construing this same act, held that bonds issued to aid a company in improving a water power for the purpose of propelling public gristmills were issued to aid in constructing a "work of internal improvement," and indorsed the decision in *Traver* v. *Merrick Co.*, as a correct exposition of the statute.

A statute of Kansas authorized towns and counties to issue bonds "for the purpose of building bridges or to aid in the construction of railroads, water powers or other works of internal improvement." Kan. Laws 1872, ch. 68, § 1. Another statute declared all custom gristmills to be public mills, and regulated their management.

In *Township of Burlington* v. *Beasley*, 94 U. S. 310, it was held that bonds issued to aid in the construction of a steam custom mill were authorized by the statute,—in other words, that a steam custom mill was a work of internal improvement,—the court saying that the expression is usually applied to railroads and canals, but to confine it to those two subjects would be to give the statute a narrow construction; also, that railroads, turnpikes, buildings, bridges, ferries, reclaiming swamps, and the like, are no doubt improvements, and, if such improvements are within the limits of a town or county, they are internal to such town or county. In this case, as in others, the terms, "works of internal improvement," "public improvements," and "public works," seem to be used as synonymous.

In *Sparrow* v. *Commissioner State L. O.*, 56 Mich. 567, (23 N. W. 315,) the court, speaking through Justice Campbell, commenting on a provision in the constitution of that state the same as in our own, says: "The phrase is as broad as language can make it. It can make no difference for what direct or indirect purpose of public utility an improvement is made, so long as it comes within such a definition. All works of convenience, whether for travel, drainage, or irrigation, are similar in their nature. Any such work that is deemed important enough for the state to construct is within the rule, and, if not built in the permitted way, [by devoting thereto the avails of any grant to the state for that specific purpose,] is within the prohibition."

In *Leavenworth Co.* v. *Miller*, 7 Kan. 493, in commenting on a similar provision in the constitution of that state, the court says: "The state, as a state, is absolutely prohibited from engaging in any

works of internal improvement. We will concede that this prohibition does not extend to the building of a statehouse, penitentiary, state university, and such other public improvements as are used exclusively by and for the state as a sovereign corporation; but it does extend to every other species of public improvement." And again, in the same case, in enumerating the kind of improvements which the state is prohibited from making, the court mentions, among others, drains, waterworks, gas works, and the like. These cases clearly indicate the general under- standing of the judicial mind as to the meaning of the term "works of internal improvement," as used in statutes and constitutions, and demonstrate that the courts have never supposed that it was to be restricted to channels of travel and commerce, but, on the contrary, have always assumed that it included "any kind of work that is deemed important enough for the state to construct," except, of course, as indicated in *Leavenworth Co.* v. *Miller, supra,* those which are used exclusively by and for the state, as a sovereign, in the performance of its governmental functions, such as a state capitol, state university, penitentiaries, reformatories, asylums, quarantine buildings, and the like; for education, the prevention of crime, charity, and the preservation of public health are all recognized functions of state government. The distinction between buildings for such purposes, and an elevator in which to carry on the business of storing grain, is too palpable to require argument, and the attempt to liken the latter to the former is little less than absurd.

The far-reaching consequences of restricting this constitutional inhibition to highways for travel and commerce can readily be foreseen. It would leave the state, through its legislature, at liberty, in every period of inflation or excitement, to embark in any and every other sort of enterprise, outside of its legitimate governmental functions, which might be deemed of public benefit. It would admit, not only of building grain elevators, but also of engaging in schemes of drainage, irrigation, developing water powers, building public gristmills, public creameries and cheese factories, establishing stock yards and packing houses, and other like enterprises, almost without limit. Certainly, to engage in such enterprises as these at the expense of the taxpayers of the state is quite as much within the mischiefs aimed at by the constitution as to

engage in the construction of highways for commerce; and there is even less excuse for it, for public highways for traffic and travel are of more general public importance, and less capable of being furnished by unaided individual enterprise.

The time was when the policy was to confine the functions of government to the limits strictly necessary to secure the enjoyment of life, liberty, and property. The old Jeffersonian maxim was that the country is governed the best that is governed the least. At present, the tendency is all the other way, and towards socialism and paternalism in government. This tendency is, perhaps, to some extent, natural, as well as inevitable, as population becomes more dense, and society older, and more complex in its relations. The wisdom of such a policy is not for the courts. The people are supreme, and, if they wish to adopt such a change in the theory of government, it is their right to do so. But in order to do it they must amend the constitution of the state. The present constitution was not framed on any such lines.

It is always a delicate as well as an ungracious task to declare invalid an act of a co-ordinate branch of the government, and should never be done, except in cases free from reasonable doubt. But the legislature is not the people, any more than are the executive and judiciary. Like them, it is a branch—doubtless the most important one—of the government, and, equally with them, subject to the limitations imposed by the constitution; and, whenever it has clearly transcended those limitations, it is the duty of the judiciary to so declare. The act now under consideration seems to us so clearly in violation of the constitution that it is our bounden duty to so hold.

Order reversed.

(Opinion published 57 N. W. Rep. 331.)