409 So.2d 1382 (1982)
Faye M. CHURCHILL, et al.
v.
BOARD OF TRUSTEES OF the UNIVERSITY OF ALABAMA IN BIRMINGHAM, et al., etc.
BOARD OF TRUSTEES OF the UNIVERSITY OF ALABAMA IN BIRMINGHAM, et al., etc.
v.
Faye M. CHURCHILL, et al.
80-601, 80-601A.
Supreme Court of Alabama.
February 26, 1982.
*1384 Barry V. Hutner and Robert R. Kracke of Kracke, Woodward & Thompson, Birmingham, for appellants.
Gene R. Smitherman, Birmingham, for appellees.
JONES, Justice.
Plaintiffs (private hearing aid specialists/dealers and the Alabama Hearing Aid Dealers Association) sued Defendants (Board of Trustees of the University of Alabama in Birmingham and Dr. Alan W. Eisele), alleging unfair competition in the sale of hearing aids by the University's Speech and Hearing Center. A temporary restraining order was issued, perfected by bond, and renewed until judgment could be rendered. The trial court ruled in favor of Defendants, dissolved the TRO and released and discharged the sureties on the injunction bond. This appeal (and Defendants' cross appeal) is the result of the trial court's denial of Plaintiffs' motion for a new trial and Defendants' motion to amend the order with respect to the release and discharge of the principal and sureties on the bond.
We affirm as to both the appeal and the cross appeal.

The Appeal
We summarize Plaintiffs' argument: Neither the State nor its agencies may engage in private business or in activities which amount to unfair competition with the private business sector; neither may the State authorize any of its political subdivisions to so engage.
Plaintiffs cite numerous cases which hold that the purpose of the State is to protect its citizens in their business enterprises and not to engage in commercial enterprises itself. Plaintiffs depend heavily upon the language in the Minnesota case of Rippe v. Becker, 56 Minn. 100, 57 N.W. 331 (1894), which holds that:
"The time was when the policy was to confine the functions of government to the limits strictly necessary to secure the enjoyment of life, liberty, and property. The old Jeffersonian maxim was that the country is governed the best that is governed the least. At present, the tendency is all the other way, and towards socialism and paternalism in government.... The wisdom of such a policy is not for the courts. The people are supreme, and, if they wish to adopt such a change in the theory of government, it is their right to do so. But in order to do it they must amend the constitution of the state. The present constitution was not framed on any such lines."
Plaintiffs insist that the activities of the University's Speech and Hearing Center in selling hearing aids violate § 35 of the Alabama Constitution, which states:
"That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression."
The sale of hearing aids, contend Plaintiffs, is not a function of education or instruction of this agency of the government.
Defendants' counter argument, in support of the trial court's order, is summarized as follows:
This is clearly a case calling for a balancing of interests. However, because of: 1) Code 1975, § 16-47-1, which states that that Board of Trustees of the University of Alabama is a public corporation with the purpose of the administration of a seminary of learning; and 2) § 16-47-2, which authorizes the Board to exercise those powers reasonably incidental to or implied by the promotion of the above-stated purpose, the trial court did not err in concluding that UAB has the legal authority to engage in the dispensing of hearing aids, that activity being incidental to the main purpose of the complete audiology program of UAB.
*1385 The trial court was correct, insist Defendants, in concluding that the decisions of UAB as to how to conduct its educational activities should not be overturned, because the decision was not made capriciously, arbitrarily or in bad faith (the applicable standard in such cases).
In support of their cross appeal, claiming the trial court incorrectly discharged the sureties on the injunction bond upon dissolution of the TRO without permitting the recovery of damages under the bond, Defendants cite the case of Satellite Broadcasting Co. v. Tingley, 286 Ala. 571, 243 So.2d 677 (1970); and ARCP 65(c), 65.1.
The trial court's order includes findings of fact, for which we find ample support in the evidence of record, and conclusions of law, which we adopt, to the extent of the parts quoted herein, as the opinion of this Court:
"Testimony indicates that the Plaintiffs own and represent the sales of approximately 80% of the hearing aids dispensed in the Birmingham area. Several of the Plaintiffs have more than one business location and some of these locations are in other cities in Alabama. The testimony further indicates that the useful life of a hearing aid is approximately 3.7 years and that repeat business is very important to a hearing aid dealer.
"The sale of hearing aids in total dollars and total units has been increasing. It is noted that one of the Defendants' witnesses, Dr. David Goldstein of Purdue University testified that approximately 77% of hearing impaired children have hearing aids while only approximately 17% of hearing impaired adults have hearing aids. Given the relatively short useful life of the hearing aids the increase in sales is logical. For whatever reason, of the Plaintiffs who testified on the subject, all reported increases in sales. Mr. Patillo simply testified that business was `up' in 1980. Mrs. Churchill's revenues rose and the unit sales increased from 113 in 1978 to 136 in 1979 and 166 in 1980. Mr. West's unit sales increased from 250 in 1979 to 340 in 1980. While there was a great deal of speculation as to what would happen to their business if the Defendants were allowed to sell hearing aids, there was no conclusive evidence since the Temporary Restraining Order was issued less than three months after Defendants began selling the hearing aids.
"There was testimony by various Plaintiffs that a large portion of their business was derived from referrals from UAB's speech and hearing clinic. However, Plaintiffs, Pitts, Walter, Churchill and Patillo, all testified that they have not been getting many referrals lately. Mr. Patillo hasn't received any referrals for approximately two years and Mrs. Churchill gets approximately 95% of her business from referrals from doctors.
"Although it varies slightly from month to month, UAB's speech and hearing clinic sees approximately 500 patients per month. Defendants estimate that the normal patient load will generate sales of 25 to 30 hearing aids per month. The number of hearing aids that might be sold per month is disputed; however, it is noted that Plaintiffs' witness, Dr. D. R. Schumaier, testified that his business sees between 20 and 40 patients per day and that he sells between 35 and 40 hearing aids per month. Defendants' estimates, therefore, seem to be within reasonable expectation. It is further noted that Dr. Eisele testified that if hearing aids are sold by the Defendants, the total number of patients seen each month may decrease due to the additional time required in connection with the fitting and adjustment of the hearing aids.
"A good amount of testimony concerned the changing ethics of the audiology profession as published by the American Speech, Language and Hearing Association (`ASHA') and other professional associations. Some testimony and argument has been directed at the method of such changes. The Court, therefore, feels that it should state at the outset, that to extent Plaintiffs' arguments are to the effect that audiologists should not sell hearing aids, or should not be trained in the practice and procedure required to be able to correctly prescribe and fit hearing aids, the Court *1386 rejects the argument. At that point in the argument, the Plaintiffs would be asking for protection against competition per se, not from unfair competition from state supported non-profit universities.
"It appears to the Court that the question of a properly licensed audiologist's right to sell hearing aids has been settled and the Court rules that the properly licensed audiologist may sell hearing aids. In support of its position the Court cites the Code of Alabama, 1975, Section 34-28A-1 et seq., and the Opinion of the Attorney General of the State of Alabama dated February 9, 1979, and addressed to the chairperson of the Alabama Board of Examiners for Speech Pathology and Audiology. The Opinion of the Attorney General was admitted into evidence as Defendants' Exhibit # 4.
"The Opinion states in part:
"`The authority granted (in the state law) for audiologists to engage in "hearing aid evaluation and application" for the purpose of ameliorating or modifying hearing disorders in individuals would clearly seem to include the fitting and dispensing of hearing aids. In fact, it would not appear possible for an audiologist to perform the functions authorized by the statute without being able to fit patients with a hearing aid.'
"On the other hand, it is the opinion of the Court that UAB may not engage in the sale of hearing aids solely for the purpose of raising revenues. Plaintiffs' Reply Brief contains numerous cases supporting this general proposition. Although most of the cases are old and some have either been distinguished in other cases or had contrary opinions rendered in similar fact situations in their own jurisdiction, the general proposition of law still seems to be appropriate. The funds which UAB uses would, at least in the first instance, be derived from taxes and/or tax exemptions. Tax revenues are to be used for public, not private, purposes. It is not easy to determine in every case whether a benefit conferred upon many individuals in a community can be called a public service within the meaning as applied to tax revenues. However, in general it may be said that the promotion by taxation of the private interests of many individuals is not a public service within that meaning as applied to tax revenues. (Opinion of the Justices (1892) 155 Mass. 598, 15 L.R.A. 809, 30 N.E. 1142.) In Mackey v. Reeves (1919) 42 S.D. [340] 347, 175 N.W. 359, the Court in interpreting a constitutional provision stating:
"`Taxes _ _ _ shall be levied and collected for public purposes only;'
stated:
"`An appropriation of public moneys to be constitutional must be for some use or object which, directly or indirectly, in some degree or manner will materially aid in the proper functioning of some governmental agency, and in so doing will serve a public purpose.'
"Further, in Rippe v. Becker (1894) 56 Minn. 100, 22 L.R.A. 857, 57 N.W. 331, the Court said:
"`The police power of the state to regulate a business does not include the power to engage in carrying it on.'
"Section 35 of the Alabama Constitution of 1901 states:
"`That the sole object and only legitimate end of government is to protect the citizens in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression.'
"While the Court has not found a case which specifically deals with this language, two other cases cited by Plaintiffs may be mentioned. In Opinion of the Justices (1919) 118 Me. 503, 106 A. 865, the Court stated:
"`The State cannot enter upon a commercial enterprise, however alluring the prospect, and tax the people for its promotion _ _ _ In other words, a state is singly a political unit, and not a business corporation, except incidentally to further its political purposes.'
"And in McCullough v. Brown (1894) 41 S.C. 220, 23 L.R.A. 410, 19 S.E. 458, this question was discussed as follows:
*1387 "`Although there may be no express restrictions contained in a state Constitution forbidding the imposition of taxes for any other purpose than a public purpose, yet such a restriction must necessarily be implied from the very nature of civil government; and hence the legislative department, under the general power of taxation conferred upon it, cannot impose any tax except for some public purpose. Upon the same principle it seems to us clear that any act of the legislature which is designed to, or has the effect of, embarking the state in any trade which involves the purchase and sale of any article of commerce for profit, is outside and altogether beyond the legislative power conferred upon the general assembly by the Constitution, even though there may be no express provision in the Constitution forbidding such an exercise of legislative power. Trade is not, and cannot properly be, regarded as one of the functions of government. On the contrary, its function is to protect the citizen in the exercise of any lawful employment, the right to which is guaranteed to the citizen by the terms of the Constitution, and certainly has never been delegated to any department of the government.'
"While it is the opinion of the Court that UAB may not engage in the sale of hearing aids solely for the purpose of raising revenues, UAB does have the right, authority and duty to provide an educational opportunity for its students and it is granted a wide latitude in the establishment of the type of curriculum it offers and the requirements thereof. Code of Alabama 1975, Section 16-47-1, states:
"`The governor and the state superintendent of education, by virtue of their respective offices, the trustees heretofore appointed from the different congressional districts of the state under the provisions of section 264 of the Constitution and such other members as may be from time to time added to the board of trustees and their successors in office are constituted a body corporate under the name of "the board of trustees of the University of Alabama," to carry into effect the purposes and intent of the congress of the United States in the grant of lands by the act of April 20, 1818, and of the act of March 2, 1819, to this state, to be by it held and administered for the benefit of a seminary of learning.'
"Section 16-47-2 then says:
"`Such corporation shall have all the rights, powers and franchises necessary to or promotive of the end of its creation and shall be charged with all the corresponding duties, liabilities and responsibilities.'
"As will be noted later, it is important that the University of Alabama System is a corporation with the requisite power of a corporation. Section 16-47-34 refers to the powers of the university's board of trustees and says:
"`The board of trustees has the power to organize the university by appointing a corps of instructors, who shall be styled the faculty of the university, and such other officers as the interest of the university may require; ... to fix their salaries or compensation, ... to institute, regulate, alter or modify the government of the university, as it may deem advisable; to prescribe courses of instruction, rates of tuition and price of board and regulate the necessary expenses of students; and to confer such degrees as are usually conferred by similar institutions. It may delegate to the faculty of the university, or other officers, such powers and functions in the government of the students and in the administration of the affairs of the university as it may deem proper; ...'
"Since the Department of Biocommunication is a joint department of the schools of dentistry and medicine, the Court also references the authority of the board of trustees of the University of Alabama to maintain and operate the schools of dentistry and medicine and to set, establish and maintain standards of scholarship and teaching in accordance with certain national standards (Section 16-47-54 and Section 16-47-94.).
*1388 "Counsel for the Plaintiffs introduced UAB's 1980-82 Graduate School Bulletin (Plaintiffs' Exhibit # 4) to show that `the Department of Biocommunication does not currently offer a graduate degree program.' (p. 64) The Bulletin goes on to state: `However, it does offer several graduate level courses of interest to students in other degree programs, and available to any qualified student.' (p. 64) Furthermore, the testimony of Dr. Fletcher and Dr. Eisele indicated that UAB intended to create a graduate level program which would instruct approximately 18 students at one time in various levels of graduate work. Dr. Eisele was hired because of his expertise in the area of teaching and research in the dispensing of hearing aids and his ability to develop such a program at UAB.
". . .
"[I]t is the opinion of the Court that UAB has the authority to establish educational programs related to audiology and to set the standards and course curriculum in connection therewith. Since the practice of audiology includes the dispensing of hearing aids, the Court finds that UAB may instruct its students in the various aspects of testing, fitting, and dispensing of hearing aids.
". . .
"It is therefore apparent, from the testimony of experts of both parties, that if patients are sent to private hearing aid dealers, they do not generally return to the university clinics for follow-up evaluations and rehabilitation.
"The failure of the patients to return to the university clinic has several negative impacts on the educational program offered by a clinic. The student loses the opportunity to engage in the hearing aid fitting process and in the post-hearing aid fitting rehabilitation and management of patients in order to observe the consequence of their work and receive feed-back from the patients.
"An additional consideration is the research aspect of a university's program. Dr. Fletcher holds several patents on hearing aid and related devices and is engaged in on-going research in this field. The follow-up aspects of patient care were shown to be important parts of a research program.
"The Court finds that, from the testimony and evidence given in this case, there were ample reasons for the Defendants to change their procedure and methods of dispensing hearing aids and therefore the Defendants did not act in an arbitrary or capricious manner, or in bad faith, in beginning to dispense hearing aids to the patients of the university clinic.
". . .
"The argument by which Plaintiffs wish to limit the Defendants' dispensing of hearing aids to indigent patients reaches the final point for determination in this case. If the Defendants have a right to dispense hearing aids in the university clinic as a proper exercise of the teaching curriculum, may the hearing aids be sold to patients, thus bringing the Defendants into competition with the Plaintiffs? It is noted that the Plaintiffs and Defendants are already in some form of competition for the services rendered in connection with the initial testing of the patient to determine the nature and extent of the hearing impairment and that fees are charged for such services. The Plaintiffs, however, have not challenged this practice or service."
After an extensive discussion of the authorities relating to the issue presented,[1] the decree continues:
"The Court concludes that the sale of hearing aids by the Defendants is incident to the education program of UAB and that the Temporary Restraining Order which was granted on the 26th day of November, 1980, and continued to date, is due to be dissolved. It should be noted that the Court, at the beginning of this opinion, stated that, in its opinion, UAB *1389 could not engage in the sale of hearing aids, solely for the purpose of raising revenues, and therefore, it is the opinion of the Court that UAB may only engage in the dispensing and sale of hearing aids so long as it remains incident to its educational program and is not a purely revenue generating program."
Admittedly, Plaintiffs' constitutional attack is highly persuasive. The prohibition of § 35 is not to be taken lightly. The "compelling need" criterion for governmental involvement in profit-making ventures mandates that each challenged activity undergo careful scrutiny on a case by case basis to avoid the constitutional "usurpation and oppression" admonition.
We emphasize that had the trial court found that the commercial aspect, rather than the instructional aspect, was the principal factor in the sale of the hearing aids, and if the evidence supported such a finding, then we should not hesitate to embrace Plaintiffs' constitutional challenge.
We believe the evidence before us, however, amply supports the conclusion that the dispensing of hearing aids, although in the broadest sense it is in competition with private enterprise, is a function which is reasonably related to and promotive of the educational, research, and service mission of a modern university.
Stated another way, the trial court's finding that "Defendants did not act in an arbitrary or capricious manner, or in bad faith, in beginning to dispense hearing aids to the patients of the university clinic," is sustainable as having an ample evidentiary basis in the record. Therefore, the judgment with respect to the issue presented on appeal is affirmed.

The Cross Appeal
Taken literally, the language of ARCP 65.1 seems to support the Cross Appellants' position. It is true that the trial judge dissolved the injunction and discharged the principal and sureties on the injunction bond in a single decree adjudging the issues as framed and presented on the merits. That is to say, the prevailing partythe party against whom the injunction was imposed for slightly less than four months was not given an opportunity to proceed by motion to establish and enforce the principal's and/or sureties' liability on the injunction bond.
Upon due consideration, however, we believe the particular circumstances require our affirmance of the trial court's action with regard to the bond.
Ordinarily, a petition for a temporary restraining order or a preliminary injunction addresses itself to the sound discretion of the trial court, and its grant preserves the status quo between the affected parties, pending the adjudication of the issues on the merits. While the injunction, in a technical sense, cannot be termed an ancillary proceeding, it partakes of the nature of a proceeding which is outside or beyond the main case and the issues presented for adjudication therein. In such cases, the post-adjudication procedure prescribed by ARCP 65.1 is obligatory and is a matter of right of the moving party.
But this ordinary situation contemplated by the Rule is not the situation now before us. The only ultimate relief sought by Plaintiffs in the instant declaratory judgment action is one for injunction. The issue of injunction is the issue for adjudication on the merits. We hold that, under the court's equity jurisdiction, its discretionary power with regard to the awarding of damages pursuant to an injunction bond has been exercised in substantial compliance with the spirit of Rule 65.1.
Although Plaintiffs effectively prevented operation of an incidental portion of Defendants' activities for almost four months, it certainly was not an abuse of discretion for the court to find, as is implicit from the tenor of the court's final judgment, that the suit, including the prayer for injunctive relief, had been brought in good faith. Moreover, a consideration of the totality of the circumstances and a balancing of the equities may justifiably have led the court to the informal conclusion that a relatively *1390 brief cessation in the dispensing of hearing devices did not so materially encumber the clinic's overall operation as to warrant an award of damages under the bond. H & R Block, Inc. v. McCaslin, 541 F.2d 1098 (5th Cir. 1976).
Furthermore, the presumption of correctness accorded the trial court's exercise of discretion in such matters is strengthened by its order denying the motion to modify that portion of its final decree.
AFFIRMED AS TO THE APPEAL.
TORBERT, C. J., and MADDOX, FAULKNER and SHORES, JJ., concur.
ALMON and BEATTY, JJ., dissent.
EMBRY, J., recuses himself.
ADAMS, J., not sitting.
AFFIRMED AS TO THE CROSS-APPEAL.
MADDOX and FAULKNER, JJ., concur.
ALMON, SHORES and BEATTY, JJ., concur in the result.
TORBERT, C. J., dissents.
EMBRY, J., recuses himself.
ADAMS, J., not sitting.
TORBERT, Chief Justice (concurring as to the appeal; dissenting as to the cross appeal).
I agree with the majority as far as its decision pertains to the affirmance of the lower court's decision that "Defendants did not act in an arbitrary or capricious manner, or in bad faith, in beginning to dispense hearing aids to the patients of the university clinic." I do not agree, however, with the majority's decision in the cross appeal. The discharge of the principal and sureties on the injunction bond prevents cross appellants from pursuing an action for damages against the bond.
ARCP 65.1 gives the trial court the authority to determine liability on the bond, if any, by motion without the necessity of an independent action. "On the other hand, the rule is permissive and does not prohibit the bringing of an independent action against the surety ...." 11 Wright & Miller, Federal Practice and Procedure, § 2971 (1973). "While the rule creates a motion procedure for enforcement of the liability of surety, the right to an independent action continues." 2 Lyons, Alabama Practice 65.1.2 (1973). This means that the trial court may go ahead and have a hearing on the liability of the party who requested the ex parte injunction, if it so desires, but if the court does not wish to go ahead and consider this issue, the party against whom the injunction was issued may still seek damages against the bond through an independent action. The discharge of the principal and sureties by the trial court denies the cross appellants this right.
As the record shows, the injunction was dissolved by the trial court. "For an injunction to be dissolved, it must be established there is no equity, in effect, that the action is without merit." Satellite Broadcasting Co. v. Tingley, 286 Ala. 571, 577, 243 So.2d 677 (1971). "The [injunction] is obtained upon an ex parte hearing and the bond is required as a protection against the abuse of this extraordinary process and to prevent oppression by its use. The bond is the contract of the parties executing it, the statute prescribes its terms and conditions, and the right of action arises immediately upon its breach." Miller v. Wood, 257 Ala. 594, 60 So.2d 353 (1952).
Our courts have stated:
"By filing the application and the required bond the applicant takes his chance that there may be dissolution upon motion. He has, by making the bond, entered into a contract that in the event there is dissolution the bond becomes due for damages resulting from the issuance of the injunction. Upon breach of the condition of the bond a right of action thereon arises immediately. In requesting the extraordinary relief of a temporary injunction and making the bond the applicant in colloquial language `pays his money and takes his *1391 chances.' There is no right of defense on the `merits' to the action for damages on the bond after `dissolution' of the injunction."
Union Springs Telephone Co. v. Green, 47 Ala.App. 427, 255 So.2d 896 (1971) (citations omitted). See, National Surety Co. v. Citizens' Light, Heat, & Power Co., 201 Ala. 456, 78 So. 834 (1918).
Therefore, the trial court should have recognized the right of the cross appellants to seek damages under the bond. While the trial court could have found that no damages were warranted, I believe the trial court had to give the cross appellants the opportunity to prove their damages, if any, incurred by the imposition of the injunction. The trial court could have given the cross appellants the opportunity by motion under ARCP 65.1 or could have required an independent action. Therefore, I believe the release of the principal and sureties was improper because it denies cross appellants a cause of action which they are entitled to pursue. Consequently, I would reverse as to the cross appeal and give cross appellants the opportunity to entertain an action to prove any damages incurred during the period that the injunction was in force.
BEATTY, Justice (dissenting as to the appeal (80-601)).
This decision gives a blank check to a public institution of learning to engage in a commercial enterprise under the guise that it is "incidental" to the educational process, in violation of the Alabama Constitution, Section 35.
ALMON, J., concurs.
NOTES
[1] Among the treatises reviewed are 14 C.J.S., Colleges and Universities, § 6 (1939); and 15A Am.Jur.2d, Colleges and Universities, § 9 (1976). Also referenced is the case of Iowa Hotel Assoc. v. State Board of Regents, 253 Iowa 870, 114 N.W.2d 539 (Iowa 1962).