## L. O. COOKE v. SAMUEL G. IVERSON.[1]

July 9, 1909.

Nos. 16,267—(214).

**When Courts Can Control Action of Executive Department.**

Courts cannot, by injunction, mandamus or other process, control or

----

[1] Reported in 122 N. W. 251.

direct the head of the executive department of the state in the discharge of any executive duty involving the exercise of his discretion; but where duties purely ministerial in character are conferred upon the chief executive, or any member of the executive department, as defined by our constitution, and he refuses to act, or where he assumes to act in violation of the constitution and laws of the state, he may be compelled to act or restrained from acting, as the case may be, at the suit of one who is injured thereby in his person or his property, for which he has no other adequate remedy.

**Acts Unconstitutional — Appropriations for Roads and Bridges.**

Chapters 91, 505, pp. 82, 638, Laws 1909, purporting to appropriate money out of the general revenue fund of the state for the building and repairing of roads and bridges, are unconstitutional, for the reason that they violate section 5, art. 9, of the state constitution, forbidding the state to be a party to the carrying on of "works of internal improvement," and section 16, art. 9, prescribing the manner and limiting the extent of state aid in the construction of public highways and bridges.

Action in the district court for Ramsey county to restrain defendant, as state auditor of the state of Minnesota, from executing any warrants addressed to the state treasurer of the state of Minnesota in favor of any county, city, village or township treasurer directing the payment of any of the moneys appropriated by chapter 219, Laws 1907, as amended by Laws 1909, c. 91, and distributed or appropriated by Laws 1909, c. 505. From an order, Brill, J., overruling defendant's demurrer to the complaint and granting a motion for a temporary injunction, he appealed. Affirmed.

*George T. Simpson,* Attorney General, and *Lyndon A. Smith,* Assistant Attorney General, for appellant.

*W. B. Douglas,* for respondent.


START, C. J.

This action was brought in the district court of the county of Ramsey to enjoin the defendant, as state auditor, from issuing any warrants, payable out of the general revenue fund of the state, pursuant to chapter 91, p. 82, and chapter 505, p. 638, of the Laws of 1909. The defendant demurred to the complaint, and appealed from an order overruling his demurrer. The record presents two constitutional questions for our decision.

1. The first one is whether this action can be maintained against

the state auditor. This involves a consideration of the general proposition whether the judiciary has, in any case, jurisdiction to control or direct the chief executive, or any of the other officers constituting the executive department, of the state, as defined by article 5, § 1, of the state constitution.

Judicial decisions on this question in the different states are in hopeless conflict. Nor are the decisions of our own court, relevant to the subject, entirely consistent. This has resulted in some uncertainty as to what the rule is in this state, which ought to be set at rest. It is settled beyond all controversy that courts cannot, by injunction, or mandamus, or other process, control or direct the head of the executive department of the state in the discharge of any executive duty involving the exercising of his discretion. This necessarily follows from the constitutional division of the state government into three co-ordinate, distinct, and independent branches—legislative, executive, and judicial. Neither is responsible to the other for the manner in which it exercises its discretion in the performance of duties which are governmental or political in their character. Thus far there is no conflict of judicial authority. The conflict arises upon the question whether the rule stated is subject to the qualification that where duties purely ministerial in character are conferred upon the chief executive, and he refuses to act, or when he assumes to act in violation of the constitution and laws of the state, he may be compelled to act, or restrained from acting, as the case may be, by the courts at the suit of one injured thereby in his personal or property rights, for which he has no other adequate remedy.

This court, in the case of Chamberlain v. Sibley, 4 Minn. 228, 229 (309), recognized this exception to the general rule of the immunity of the chief executive from judicial process, and stated the rule and the exception in these words: "This court will not undertake to compel the Governor of the state to the performance of any duty devolving upon him as the chief executive, and properly pertaining to such office. In all such matters the executive is of necessity independent of the judiciary. But when some official act, not necessarily pertaining to the duties of the executive of the state, and which might be performed as well by one officer as another, is directed by law to be done, then any person who clearly shows himself

entitled to its performance, and has no other adequate remedy, may have a writ of mandamus against such officer, even although the law may have designated the chief executive of the state as a convenient officer to perform the duty."

In Rice v. Austin, 19 Minn. 74 (103), 18 Am. 330, the court, without referring to the case of Chamberlain v. Sibley, held, in effect, that the rule that the courts could not enforce the performance of official duties by the Governor included duties of a purely ministerial character involving no discretion. The duty sought to be enforced in that case was not purely a ministerial one, and what was said as to such duties was not necessary to the decision. The case of Rice v. Austin was followed in the case of State v. Dike, 20 Minn. 314 (363) and it was held that the rule included all of the officers named in article 5, § 1, of the state constitution, which provides that: "The executive department shall consist of a governor, lieutenant governor, secretary of state, auditor, treasurer, and attorney general." It was again broadly stated in Western R. Co. v. De Graff, 27 Minn. 1, 6 N. W. 341, following the cases we have referred to, that no act done or threatened to be done by any member of the executive department of the state, in his official, but not in his individual, capacity, could be brought under judicial control or interference, even where such acts were purely ministerial in their character. The duties enjoined upon the Governor under consideration in that case were not ministerial in their character, but involved the exercise of discretion on his part. The rule, without the qualification as to purely ministerial duties, was stated and applied to the state auditor in the cases of State v. Whitcomb, 28 Minn. 50, 8 N. W. 902, and State v. Braden, 40 Minn. 174, 41 N. W. 817.

In the case of Hayne v. Metropolitan Trust Co., 67 Minn. 245, 69 N. W. 916, this court was confronted with the question whether a member of the executive department of the state was subject to judicial control as to purely ministerial duties. In that case certain securities had been deposited with the state auditor for the security of the policy holders by an insurance company, which became insolvent, and for which a receiver was appointed. The receiver demanded of the state auditor a delivery of the securities, to the end that they might be marshaled for the benefit of their real owners, the

policy holders. The demand was refused, and the action was brought to compel the state auditor to comply with the demand. He demurred to the complaint on the ground .that the court had no jurisdiction over him as a member of the executive department of the state. His contention was sustained in the district court, but on appeal this court held otherwise, on the ground that the auditor was holding the securities, in which the state had no interest, as custodian, a minis-terial duty, and that in respect to their disposition he was subject to the jurisdiction of the courts. In reaching this conclusion the court (page 251) said:

"This court has undoubtedly gone further than any other in holding executive officers of the state exempt from the control of the courts in the performance of their official duties. This is especially true as to executive officers other than Governor. It will be found, however, that in many of these case what was said went further than what was decided. * * * It cannot be that because this trust fund, in which the state has not a dollar's interest, happens to be in the possession—and unlawfully at that—of an executive officer of the state, he can refuse to surrender the property, continue to hold it unlawfully, and thus deprive the policy holders of what belongs to them, and yet the courts can give them no relief, because an executive officer of the state is not subject to the control of the judicial department of the state government."

In the cases of Higgins v. Berg, 74 Minn. 11, 76 N. W. 788, 42 L. R. A. 245, Davidson v. Hanson, 87 Minn. 211, 91 N. W. 1124, 92 N. W. 93, and State v. Hanson, 93 Minn. 178, 100 N. W. 1124, 102 N. W. 209, this court entertained proceedings against the secretary of state to direct him with reference to the making up of the official state ballots, as provided by the statute (G. S. 1894, § 48). This the court clearly could not have done if the constitution forbade the control by the courts of any member of the executive department of the state in the discharge of ministerial duties. These election cases and the case of Hayne v. Metropolitan Trust Co. necessarily hold that such officer may be controlled by the courts in the discharge of purely ministerial duties. They well illustrate the necessity and justice of such control. If the action or nonaction of the secretary of state in making up the official ballots is beyond the control of the courts, because the statute giving courts jurisdiction in such cases is

unconstitutional, then he has the absolute power, practically, to say for whom the electors may or may not vote. Such a proposition is an unthinkable one; for, as said by this court in McConaughy v. Secretary of State, 106 Minn. 392, 416, 119 N. W. 417:

"Every officer under a constitutional government must act according to law and subject to its restrictions, and every departure therefrom or disregard thereof must subject him to the restraining and controlling power of the people, acting through the agency of the judiciary; for it must be remembered that the people act through the courts, as well as through the executive or the legislature. One department is just as representative as the other, and the judiciary is the department which is charged with the special duty of determining the limitations which the law places upon all official action."

If a member of the executive department of the state is subject to the control of the judiciary in the discharge of purely ministerial duties, it logically follows that he is subject to such direction if he is threatening to execute an unconstitutional statute, to the irreparable injury of a party in his person or property. Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857. If a statute be unconstitutional it is as if it never had been. Rights cannot be built up under it, and, if an executive officer attempts to enforce it, his act is his individual and not his official act, and he is subject to the control of the courts as would be a private individual. Cooley, Const. Lim. 250; Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714.

Upon principle, and a full consideration of the previous decisions of this court relevant to the question, we hold that: Courts cannot, by injunction, or mandamus, or other process, control or direct the head of the executive department of the state in the discharge of any executive duty involving the exercise of his discretion; but where duties purely ministerial in character are conferred upon the chief executive, or any member of the executive department, as defined by our constitution, and he refuses to act, or when he assumes to act in violation of the constitution and laws of the state, he may be compelled to act, or restrained from acting, as the case may be, by the courts at the suit of one who is injured thereby in his person or property, for which he has no other adequate remedy.

It follows that the district court had jurisdiction of the state

auditor in this case for the purpose of determining the constitutionality of the statutes he was threatening to execute, and to restrain him if they were found to be unconstitutional.

2. This brings us to a consideration of the second question, the constitutionality of chapters 91 and 505 of the Laws of 1909. Chapter 91 purports to appropriate the sum of $300,000 annually out of the general revenue fund of the state to aid in building and repairing highways and bridges, to be expended in such places and under the supervision of such persons as the legislature may designate. Chapter 505 provides for the distribution of the appropriation for the fiscal years ending July 31, 1910, and 1911, respectively, to the several counties of the state to aid in the construction and repair of highways, and designates the officers and persons under whose supervision the money is to be expended in each county.

Section 5, art. 9, of our state constitution, provides that: "The state shall never contract any debts for works of internal improvement, or be a party in carrying on such works, except in cases where grants of land or other property shall have been made to the state, especially dedicated by the grant to specific purposes, and in such cases the state shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in aid of their completion." It may be fairly inferred that the exception in this section refers to grants of land or other property made by congress to the several states to aid in works of internal improvement.

In 1872, section 32b, art. 4, of the constitution was adopted (Laws 1872, p. 62, c. 14, § 1), providing for the sale of all lands donated to the state under the act of congress approved September 4, 1841 (Act. Sept. 4, 1841, 5 St. 453, c. 16), to be applied "to objects of internal improvement * * * namely: Roads, railways, bridges, canals and improvement of water-courses, and draining of swamps," and that the money arising from such sale should constitute the internal improvement land fund which should not be appropriated for any purpose whatever without the approval of the electors of the state. In 1898 (Laws 1897, p. 600, c. 333), provision was made by an amendment to the constitution (section 16, art. 9) for the appropriation of this fund to the improvement of public highways and

bridges by transferring it to the road and bridge fund, and for the increase of that fund by a limited tax upon all the property of the state. The provisions of section 16 are as follows:

"For the purpose of lending aid in the construction and improvement of public highways and bridges, there is hereby created a fund to be known as the 'state road and bridge fund.' Said fund shall include all moneys accruing from the income derived from investments in the internal improvement land fund, or that may hereafter accrue to said fund, and shall also include all funds accruing to any state road and bridge fund, however provided. The legislature is authorized to add to such fund for the purpose of constructing or improving roads and bridges of this state by providing, in its discretion, for an annual tax levy upon the property of this state of not to exceed in any year one-twentieth of one mill on all the taxable property within the state. The legislature is also authorized to provide for the appointment by the Governor of the state of a board to be known as the 'state highway commission,' consisting of three members, who shall perform such duties as shall be prescribed by law without salary or compensation other than personal expenses. Such commission shall have general superintendence of the construction of state roads and bridges and shall use such fund in the construction thereof and distribute the same in the several counties in the state upon an equitable basis.

"Provided, further, that no county shall receive in any year more than three per cent. or less than one-half of one per cent. of the total fund thus provided and expended during such year; and provided, further, that no more than one-third of such fund accruing in any year shall be expended for bridges, and in no case shall more than one-third of the cost of constructing or improving any road or bridge be paid by the state from such fund."

This section 16 was amended in 1906 (Laws 1905, p. 280, c. 212) by omitting the provision for a state highway commission, and the one limiting the amount that might be expended for bridges in any year, and by increasing the authorized tax levy for the construction and repair of roads and bridges to one-fourth of a mill.

It is a significant fact that from the adoption of our constitution to the year 1907, with only sporadic exceptions (see Sp. Laws 1868,

p. 446, c. 140), no appropriations were made from the general revenue fund of the state for the construction or repair of roads and bridges, but that all appropriations for such purposes were made from funds accruing from grants of land and other property donated to the state in aid of works of internal improvement within the state; or, in other words, for nearly half a century after the adoption of the constitution the work of constructing and repairing of roads and bridges was left to the counties, towns, and other municipalities of the state, as was the case when the constitution was framed and adopted. This practical construction of section 5, art. 9, of the constitution and the subsequent amendments we have referred to are entitled to great weight in considering the validity of the statutes here in question.

It is obvious from a mere reading of section 5 that if the term "works of internal improvement" used therein, includes public roads and bridges, the statutes are void, for they make the state a party in carrying on a work of internal improvement which is forbidden by the constitution. If one furnishes the money and directs the execution of an enterprise, he is a party in carrying it on. Now, when our constitution was framed and adopted, the term "works of internal improvement" was well understood by the people, statesmen, and jurists to include, whatever else was embraced therein, the construction of public highways. Rippe v. Becker, 56 Minn. 100, 112, 57 N. W. 331, 22 L. R. A. 857. This proposition is substantially conceded by the attorney general in his brief in these words: "It therefore clearly appears that the words 'works of internal improvement'—at least in the general signification of the same—originally did include, not only those works in which the state might and did engage for profit or loss, but also included the ordinary paths of intercourse, commonly known as the public highways." It is, however, his contention, in effect, that the words in which the prohibition was expressed were not used in their broad signification, and that it was not intended to include therein free public highways.

The pivotal question then is: Can the language of this constitutional prohibition be fairly construed as excepting therefrom the building by the state of free highways, including bridges? If it can be, it is our duty so to construe it. But it cannot be assumed that the framers of the constitution and the people who adopted it did not

intend that which is the plain import of the language used. When the language of the constitution is positive and free from all ambiguity, courts are not at liberty, by a resort to the refinements of legal learning, to restrict its obvious meaning to avoid the hardships of particular cases. We must accept the constitution as it reads when its language is unambiguous, for it is the mandate of the sovereign power. State v. Sutton, 63 Minn. 147, 65 N. W. 262, 30 L. R. A. 630, 56 Am. St. 459; Lindberg v. Johnson, 93 Minn. 267, 101 N. W. 74.

Is there any ambiguity in the language of the prohibition in section 5 which will justify us in reading into it by construction an exception of free public highways? There is none, for the common and approved usage of the words used included them. Again, the framers of the constitution were cautious, and they considered the exceptions that ought to be made to the general prohibition, and they made one, and only one, namely: "In cases where grants of land or other property shall have been made to the state, especially dedicated by the grant to specific purposes." The express mention of one thing implies the exclusion of another. It is true, as suggested by counsel for the defendant, that the framers of the constitution knew that free public highways were an absolute necessity, and that an intention to prohibit their construction and repair at the public charge cannot be imputed to them. But it cannot be inferred from this that the intention was that the state should be a party to this work of internal improvement, for it was then being carried on by and at the charge of the towns and counties of the state, pursuant to the then existing statutes, which were continued in force by the constitution until altered or repealed by the legislature. Again, counties and towns were given, by section 5 of article 11 of the constitution, such powers of local taxation as might be prescribed by law. It is true that towns and counties are mere governmental subdivisions; but it does not follow from this concession that, if the state is itself prohibited from engaging in the work of building and repairing public highways, the legislature cannot grant the towns and counties the power to do so.

The sense of the need and the wisdom of local self-government was strong at the time the constitution was framed, and it is quite clear

from the provisions of the constitution and the statutes to which we have referred that it was the purpose to continue the town and county system of public highways. It was expressly decided by this court in Davidson v. County Commrs. of Ramsey County, 18 Minn. 432, 443 (482), that the prohibition of section 5, art. 9, of the constitution did not include towns and counties, and in doing so said: "It is sufficient to say that the prohibition is in terms expressly confined to the state, and does not extend to cities, counties, and towns, * * *. There are obvious reasons why the people might see fit to deny to the state at large authority in this respect, which they would not withhold from counties, cities, and towns. This would be but one more illustration of the familiar fact that the people have a great deal more confidence in themselves, as personal managers of public affairs near at home, than in the delegated management of the same by their representatives at a distance."

The amendment to the constitution in 1898 (section 16, art. 9) is a recognition that free public highways were not excepted from the prohibition of section 5; for, if the prohibition did not include free public highways, then the state had a free hand, and might itself aid in their construction and repair to any extent the legislature might deem wise. If such were the case, there was no necessity for the amendment. It is manifest on the face of this amendment that its purpose was to authorize the state to aid in the construction of highways and bridges by a tax levy upon all the taxable property of the state to the extent of one-twentieth of one mill, which was increased by the amendment of 1906 to one-fourth of a mill. This amendment determines the manner in which the state itself may aid in the work of constructing and improving public highways, and fixes the limit of general taxation for such purpose. The manner cannot be changed nor the limitation enlarged by construction. If there was any fair doubt as to the prohibition of the state by section 5 to aid in the building of public highways, it was put at rest by section 16.

It was suggested on the argument of this case, but not in the brief of defendant's counsel, that this amendment (section 16) is void, because it is a violation of the state's contract with the federal government. The act of congress authorizing the formation of a state government, the enabling act (Act Feb. 26, 1857, c. 60, 11 St. 167),

by section 5, provided that five per centum of the net proceeds of the sale of public lands lying within the state should be paid to the state for the purpose of making public roads and internal improvements as the legislature should direct. The donation and condition were accepted by the adoption of the state constitution. It is urged that the amendment (section 16) devotes the whole of the fund arising from the sale of public lands to public roads, to the exclusion of other internal improvements, and, further, that it takes the control of the fund from the legislature. We have no occasion to construe the provisions of the enabling act referred to, or determine whether the state has kept faith with the general government; for it will be time enough for the proper tribunal to consider that question when the federal government makes complaint. We are here only concerned with the question of the effect of section 16 on the right of the legislature to appropriate money raised by general taxation to the building and repair of public highways, which is purely a state matter.

We hold that free public highways are included in the prohibition contained in section 5, art. 9, of our constitution, to the effect that the state shall not be a party to the carrying on of works of internal improvement, and that the power of the legislature to aid in the construction of such highways by appropriating moneys raised by a general tax levy—that is, from the general revenue fund of the state— is limited to the manner and the amount prescribed by section 16, art. 9, of the constitution, and, further, that chapters 91 and 505, Laws 1909, are unconstitutional.

Order affirmed.