A. J. SUNDQUIST v. ALEX FRASER AND ANOTHER.[1]

February 2, 1923.

No. 23,100.

**Act of 1921 unconstitutional.**

1. Chapter 155, Laws 1921, by which the board of county commissioners of the several counties of the state are authorized on the petition of third persons to enter upon privately owned farms and there clear designated sized tracts for agricultural uses, defraying the expense of the work by the issuance of county bonds, proportionately assessing the improved lands in reimbursement of the county for the bond issue, is not an exercise of the police power of the state, but an

[1] Reported in 191 N. W. 931.

internal improvement and a loaning of public credit, a field the state is forbidden to enter upon by sections 5 and 10 of art. 9, of the state Constitution.

Same.

2. The statute is not a forest fire preventive measure, but purely in promotion of private interests, and void as a violation of section 10 of article 9 of the state Constitution.

Action in the district court for St. Louis county to enjoin the county board of that county from calling for bids for the construction of St. Louis County Land Improvement Project No. 1 or from executing any contract for the construction of the project or from issuing bonds therefor. From an order, Fesler, J., sustaining defendants' demurrer to the complaint, plaintiff appealed. Reversed.

*McMillan & Dow*, for appellant.

*Charles E. Adams*, for respondents.

BROWN, C. J.

Suit by a taxpayer to restrain a so-called land improvement proceeding initiated under the provisions of chapter 155, p. 204, Laws 1921. There was a demurrer to the complaint which was sustained and plaintiff appealed.

The action challenges the constitutionality of the statute under which the improvement proceeding was brought on the principal ground that the purpose sought to be accomplished thereby is not public, but private, and therefore beyond the power of the legislature to extend public aid in furtherance thereof, directly or through the issuance of county bonds to defray the expense of the undertaking. Sections 5 and 10, art. 9, state Constitution.

1. The plan of internal improvements as here attempted and authorized, being for private benefit, in the clearing of land for the use of the owner, whether resident or nonresident of the state, is somewhat unusual in states having constitutional provisions and restrictions like those of this state, and finds a counterpart only in the home building, grain elevator and grist mill program inaugurated by our sister jurisdiction of North Dakota. But there

the right to enter that field of state co-operation in industrial private life was established and made legal in all respects by appropriate amendments of the state Constitution. In this state the legislature by this statute enters the field without constitutional grant, and in the face of restrictive commands to keep out.

The remarks of Mr. Justice Mitchell in the case of Rippe v. Becker, 56 Minn. 100, 118, 57 N. W. 331, 22 L. R. A. 857, are here quite pertinent. That case involved the validity of a statute providing for a state storage public elevator, which was held invalid. In the course of discussion he there said:

The time was when the policy was to confine the functions of government to the limits strictly necessary to secure the enjoyment of life, liberty and property. The old Jeffersonian maxim was that the country is governed best that is governed the least. At present, the tendency is all the other way, and toward socialism and paternalism in government. This tendency is, perhaps, to some extent, natural, as well as inevitable, as population becomes more dense, and society older and more complex in its relations. The wisdom of such a policy is not for the courts. The people are supreme, and, if they wish to adopt such a change in the theory of the government it is their right to do so. But in order to do it they must amend the constitution of the state. The present constitution was not framed on any such lines.

The comments are as true today as they were when uttered 30 years ago, with the qualification that the trend toward socialism and paternalism is now far more pronounced than at that writing. In fact the disposition to break from constitutional moorings by the entry into that field of legislation was never so active as at present. It is well that the door be kept closed, except when opened in the manner suggested by Judge Mitchell, through an amendment of the Constitution. That, with the general public welfare in mind, is the orderly and safe procedure, and is not open to criticism. The decision in that case applies at bar and condemns the statute here involved, unless some of the contentions of respondent take it without the rule there laid down. See also Minnesota Sugar Co. v.

Iverson, 91 Minn. 30, 97 N. W. 454; Castner v. City of Minneapolis, 92 Minn. 84, 99 N. W. 361, 1 Ann. Cas. 934.

2. But it is contended in support of the statute that it is in fact founded in a public purpose, in that the legislature intended thereby to aid in the prevention of forest fires in the northern part of the state; that it was designed partly in that behalf and partly in furtherance of the agricultural development of lands affected by aiding settlers and farmers in that section to clear their lands for farming operations. The statute does not sustain the contention insofar as it has reference to forest fire prevention.

It is no doubt within the authority, and perhaps the duty, of the state, acting through the legislative department, to provide such measures in the prevention of forest fires in the northern part of the state as may be adequate and effective for the purpose. In the past few years immense property loss has resulted from such fires, together with loss of life, and permanent physical injuries to many settlers. A comprehensive plan devised for that purpose, of an effective nature, would be of the first order in public welfare legislation. But the utter futility of this statute for any such end is too apparent to challenge serious attention. In fact, the thought of forest fire prevention, as expressed in the statute, is secondary to other considerations, in the alternative, and apparently made a part of the statute to supply a possible public purpose in its support. There is no general scheme of fire breaks constructed across the country to prevent the spreading of forest fires, and it seems hardly necessary to direct attention to the complete ineffectiveness in that respect of scattered and detached tracts of 5 and 10 acres each, located hither and yon in the large domain of unoccupied land in the section of the state to be affected.

3. It has also been suggested that in proceedings under the statute there is a community of interest, an interdependence between the two elements of the statute, beneficial to the landowner, justifying a compulsory joint improvement. We find no such situation or condition in the language or general purpose of the statute. A clearing of a patch of land thereunder is no way made dependent on its effect as a fire protection of the owner; the matter of fire

protection may be wholly disregarded by those conducting the proceedings, and the landowner subjected to the compulsory improvement with nothing in return save a heavy bill of expense taxed against him.

The statute is clear on this matter. Section 3 discloses the true intent of the law, and eliminates all theories of joint or reciprocal benefit. That section provides that the petition for the improvement shall state generally the nature and character of the land sought to be cleared, and particularly "the improvement and betterment that will result to the land and the community therefrom, and said improvement if ordered and constructed will result in the improvement of the public health and general welfare of that community, assigning the reasons why, and will prepare the land therein described for use and occupation for agricultural purposes and that in the absence of said improvement said land cannot be so used; that the construction of said improvement will result in the development of the community and promote and increase those conditions that will render that locality suitable for habitation and will result in the development of social and educational conditions.

The petition is submitted to appraisers appointed to examine the land and report its character and adaptability for agricultural purposes, "and the effect of fire prevention resulting from such improvement." The proceedings are under the control of the board of county commissioners and by section 8 that body is expressly authorized to "order stricken therefrom and from the report of the engineer and appraisers any land found by the county board not suitable for agricultural purposes or for other reasons not suitably adapted to said improvement."

The statute will be searched in vain for any provision requiring an improvement in the interests of fire prevention. No reciprocal benefit flows to the landowner, and the basis for a "compulsory joint improvement" is wholly lacking. Bemis v. Guirl Drainage Co. 182 Ind. 36, 105 N. E. 496. The situation would be somewhat different if an effective fire break and the improvement of the land for agricultural purposes were made interdependent; the one element contingent upon the other, each to be affirmatively established. Such,

however, is in no way attempted by the statute, the public purpose of the statute therefore wholly disappears so far as that feature of the case is concerned. There is no fire protection, and no public benefit.

Stewart v. Great Northern R. Co. 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427, in wholly foreign to the question here presented. If in that case the legislature had authorized the issuance of municipal bonds to aid in financing Stewart in his elevator business, it would have been the Becker case over again, and no doubt fell by the wayside. The only matter there before the court was whether the owner of a private grain elevator could under the statutes condemn a site therefor on the railroad right of way. The court held that he could. But the statutes involved did not compel nor authorize the issuance of municipal bonds to finance the enterprise. That is what this statute attempts, and therein lies the invalidity.

4. The effort to draw a parallel between drainage statutes and the one in question goes far astray. A statute authorizing the drainage of large tracts of marshy and overflowed land, in the interests of the general welfare, jointly beneficial to all the lands affected, is one thing, but it is quite another thing to authorize the board of county commissioners of the several counties of the state to enter upon the farms of private owners, at the request and on the petition of "two or more parties owning land in said county," and there engage in clearing small garden tracts of 5 and 10 acres, scattered here and there, confiscating the material taken from the land, and sowing the cleared tracts to grasses, where the owner, whether a resident farmer or a nonresident of the county, fails to cultivate the same. The purpose as well as the result of such a proceeding is strictly paternal and purely private. Clearing a small tract of land on the farm of one owner constitutes no benefit to the lands of his neighbors.

5. The claim of constitutional validity of the statute harmonizes with the thought that the state is the guardian of its people, with the authority and duty to enact any and all laws deemed necessary in promotion of private as well as public rights. But legislation of the kind requires an amendment to the Constitution for its sup-

port for, as remarked in the Becker case, supra, "the present Constitution was not framed on any such lines."

The extreme paternalistic character of the statute is disclosed by two provisions of section 12. It is there declared that all timber and material removed from the cleared land shall upon severance therefrom become the property of the county; provided, that if of a useful character, the county board shall reduce the assessment against the land affected to the extent of the value of the material. The constitutional or other authority for this drastic and arbitrary action is not pointed out, nor can it well be sustained on any theory of property rights and the protection thereof which the Constitution, the law of the land which hears before it condemns (Bardwell v. Collins, 44 Minn. 97, 46 N. W. 315, 9 L. R. A. 152, 20 Am. St. 547), secures to the citizen. The other provision requires the county board to seed the cleared tract to grasses if the farm owner is slow about taking advantage of the help of the state. The expense thus incurred is arbitrarily assessed against the land.

6. Finally, every purpose designed to be accomplished in behalf of the farmer and settler in the improvement of his land for agricultural use, is now secured by the Rural Credits Amendment to the Constitution, adopted at the recent election. That amendment provides

"that for the purpose of developing the agricultural resources of the state, the state may establish and maintain a system of rural credits and thereby loan money and extend credit to the people of the state upon real estate security in such manner and upon such terms and conditions as may be prescribed by law."

The legislature now in session will undoubtedly put the amendment into force and effect by appropriate legislation, thus meeting every purpose intended to be consummated by the statute in question. This will enable the farmer or landowner to conduct his own land improvements, in his own way, thus avoiding the heavy bill of costs necessarily following in the wake of expensive operations under this statute. And in view of the new law on the subject, enacted under constitutional guidance, to which no objection can

be made, we are relieved of all difficulty in declaring the one at bar unconstitutional; no benefit to the public good will in any measure by that result be hindered, obstructed or delayed. The matter of fire protection may well go back to the legislature, to the end that more comprehensive and effective methods of protection may be discovered and enacted into law than are to be found in this statute.

The demurrer to the complaint should have been overruled, and the order sustaining it is accordingly reversed.

DIBELL, J. (dissenting.)

I dissent.

The question is whether chapter 155, p. 204, Laws 1921, providing for "a county land improvement," is constitutional.

The statute is not unconstitutional under article 9, § 5, of the Constitution which provides that "the state shall never contract any debts for works of internal improvements, or be a party in carrying on such works, except in cases where grants of land or other property shall have been made to the state," etc. The statute does not propose that the state shall contract any debts for a county land improvement or be a party in carrying it on. The state takes no part in it and does not pledge its credit. The general taxpayers of the state do not contribute. It is a local improvement. Benefits are to pay the cost. The statute no more offends. section 5 than do the drainage statutes or statutes authorizing local improvements. Section 5 does not prohibit the legislature from authorizing municipal subdivisions of the state to provide drainage, or roads or sewers or sidewalks or other similar improvements, and levy taxes therefor. See Davidson v. Co. Commrs. of Ramsey County, 18 Minn. 432 (482); Cooke v. Iverson, 108 Minn. 388, 122 N. W. 251, 52 L. R. A. (N. S.) 415; Const. art. 11, § 5; Const. art. 9, § 1. It may be noted, to avoid a misunderstanding, for otherwise it is unimportant here, that the amendments of 1898 and subsequent years to section 16 of article 9, and the amendment of 1920 designated article 16, permit state aid and state construction of highways. If the statute is unconstitutional, it is because it authorized the levy of taxes or the taking of private property for a purpose not public. The case

of Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857, cited in the prevailing opinion, is without application. The grain elevator which the statute there involved authorized was thought to be an internal improvement which the state could not constitutionally undertake. It was not held that there was not a public use. It was conceded that there was. A few years later it was held that a statute authorizing the condemnation of a site for a public grain warehouse on the right of way of a railroad was constitutional. Stewart v. Great Northern Ry. Co. 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427. There was a public use. In Simmons v. Northern Pac. Ry. Co. 147 Minn. 313, 180 N. W. 114, it was held that the same statute, slightly amended, was constitutional authority for the condemnation of a like site for a public potato warehouse. Again there was a public use. In neither did the state take part and finance the owner. If it had done so Rippe v. Becker would have controlled. As it was, section 5 was not violated. In Central Lumber Co. v. City of Waseca, 152 Minn. 201, 188 N. W. 275, it was held that a home rule city, authorized so to do by its charter, might establish a municipal coal and wood yard. Here was public purpose justifying the exercise of the taxing power. Section 5 was not offended, for the state did not aid or take part. As an authority making against the constitutionality of the statute involved, Rippe v. Becker may be dismissed, for we have here no prohibited internal improvement.

The constitutional question meriting consideration is this:

Does the statute offend the Constitution by authorizing the levy of taxes or the taking of private property for other than a public purpose?

The declared purpose of the statute is stated in section 2 as follows:

"It is hereby declared to be the purpose of this act to grant to the county board of the several counties of this state within their respective counties, jurisdiction to exercise all the power and authority by this act contemplated relative to the prevention of forest fires and the improvement and preparation of land within their county suitable for agricultural purposes, by the removal from such land

under the terms and conditions herein provided of trees, brush, stumps and other similar substances which contribute to the danger of forest fires preventing or interfering with the use of said land for agricultural purposes and letting contracts therefor, and cause to be constructed the improvement hereinafter specified, and to levy and assess the cost of such improvement including all expenses connected therewith against the land benefited in proportion to the benefits received, and to issue bonds of said county for the purpose of providing funds for the immediate payment therefor or as hereinafter provided."

The statute provides for the filing of a petition for the improvement; a bond saving the county harmless from expense in the event that the improvement is not granted; the appointment of an engineer and appraisers; a survey and report; a hearing of the petition upon notice; a finding by the county board that the improvement will be of public utility, will aid in preventing forest fires, promote the general welfare and will result in agricultural benefit; an appeal to the district court; the letting of contracts; the clearing within maximum and minimum limits of a portion of each forty within the improvement district; the seeding of the cleared portion to grasses when the owner does not contemplate cropping; the assessment of benefits, and the issuance by the county of bonds to finance the improvement. Section 3, quoted in part in the majority opinion, requires the petition to set forth that the project "will result in the improvement of the public health and general welfare of the community, assigning the reasons why," etc. The petition refers to the removal of "brush and other similar substances contributing to the danger of forest fires and interfering with the use of said land for agricultural purposes," etc. Section 10 provides that the county board may order the improvement if it finds, among other things, that

"said improvement will be of public utility and benefit or will aid in preventing forest fires, promote the public health and general welfare of the community, and will result in the agricultural benefit and improvement of said community."

The finding of the county board is:

"That said improvement will be a public utility and benefit and will aid in preventing forest fires and promote the public health and general welfare of the community," etc.

In considering the constitutional validity of the statute the analogy between the proceeding which it authorizes and a drainage or irrigation proceeding is obvious. In its procedural features the statute is based upon the drainage statute.

In In re County Ditch, 142 Minn. 37, 41, 170 N. W. 883, 885, we said:

"Drainage laws are sustained on the theory that the state is exercising its police power, the right of eminent domain, or its taxing power, either to protect public health, promote the public welfare, or to reclaim waste lands and make them suitable for agricultural uses. * * * As a rule, drainage proceedings are begun for the sole purpose of reclaiming wet lands, primarily for the direct benefit of the owners thereof, and incidentally for the promotion of the public welfare by increasing the productiveness and taxable value of lands having little or no value unless drained."

The consideration of public health, commonly referred to in drainage proceedings, is not an essential to constitutionality. The promotion of public health is, in this state, a negligible factor. The primary object is the reclamation of waste lands for the profitable use of the owners for agricultural purposes with the incidental benefits accruing to the general public. The owners pay the cost for the benefit accruing to their lands and not for the promotion of public health.. In State v. Board of Co. Commrs. of Polk County, 87 Minn. 325, 335, 92 N. W. 216, 218, 60 L. R. A. 161, the court said:

"While the element of public health is often made an important factor in the consideration of statutes of this kind, it is believed that any public benefit, such as the improvement of highways, or the reclamation of large tracts of otherwise waste lands, is sufficient to support and sustain them. * * * The same doctrine is ap-

plied to the interpretation of statutes providing for the condemnation of private property for the construction of ditches through which to conduct water for the purpose of irrigating arid lands, and thus adapt them to agricultural purposes."

In O'Neill v. Leamer, 239 U. S. 244, 253, 36 Sup. Ct. 54, 58, 60 L. ed. 249, the court said:

"It has been held that it is not necessary that the state power should rest simply upon the ground that the undertaking is needed for the public health; there are manifestly other considerations of public advantage in providing a general plan of reclamation by which wet lands throughout the state may be open to profitable use."

That profit will result to particular lands is contemplated. That is why benefited lands are assessed to pay the cost. The improvement is local. A large area need not be affected. So, in Lien v. Board of Co. Commrs. of Norman County, 80 Minn. 58, 64, 67, 82 N. W. 1094, 1096, the court said:

"It does not matter that in accomplishing the public objects of the act private interests are advanced. Such a result is merely incidental and does not affect the validity of the law. * * * The benefits may be limited to the inhabitants of a small locality, and, if they are enjoyed in common by all, the use is sufficiently public."

And in O'Neill v. Leamer, 239 U. S. 244, 253, 36 Sup. Ct. 54, 58 60 L. ed. 249, the court said:

"Nor is the statutory scheme to be condemned because it contemplates improvements in districts. Drainage districts may be established as well as school districts. All lands within the established district which require drainage are to enjoy the benefits of the plan. * * * Nor is it an objection that private property within the district, which is established in execution of the public policy, will be benefited; and it is clearly not improper that the cost and expense should be apportioned according to the benefits."

The land improvement statute has in mind two objects. One is the removal of danger to life and property from forest fires; or in

any event the rendering of them less hazardous. The other is redeeming the land from its waste condition and making it fit for agricultural uses. The accomplishment of one contributes to the accomplishment of the other. The two purposes are effected by the removal of trees, brush, stumps and other substances which contribute to the danger of forest fires and interfere with the use of land for agricultural purposes. The statute provides that the clearing shall be made on the basis of 40 acre tracts. A minimum in each forty must be cleared and a maximum must not be exceeded. The purpose is to distribute the cleared portions over the whole area as the most effective method of preventing the spread of fires; and the cleared portions, unless cropped, are seeded to grasses.

It is generally known that there are in the state areas of cut-over lands, largely pine, with dead stumps and down timber and refuse, often with a dense undergrowth, all inflammable. Fires, disastrous to life and property, have from time to time swept over large areas, and more frequently over small areas. It is known that settlers, working single-handed, by the improvement of their lands, have diminished the extent of the dangerous fire areas, and to an appreciable extent have rendered many sections, still exposed, less subject to local and to general conflagrations. It has been a work of generations. By a similar but less difficult process, through cultivation, the danger of the prairie fires of years ago was eliminated. Individual settlers, clearing their lands without plan or organization and without cooperation, find themselves and their property subject to fire hazards. A community of settlers, working in harmony, lessen by their clearings the individual and collective hazard. In voluntary cooperation they can do something; but those having a community of interest do not always cooperate. Drainage might be effected without a statute if they did. Compulsory cooperation, as in drainage or irrigation projects, brings effective results.

The analogy between a drainage or irrigation proceeding and a county land improvement is not perfect. In a drainage or irrigation proceeding there is acquired in favor of one tract the right to flow another, and such other is charged with a burden in favor of the former. Land may be cleared for agricultural use though ad-

joining lands are not cleared. There is not in the same degree interdependence of tracts similarly situated as in drainage or irrigation. This is an outstanding difference. Still, the individual owner, clearing his lands, finds himself and his property appreciably less subject to fire hazards if adjoining lands are systematically cleared; for instance, an owner of a quarter section, clearing it to the extent contemplated by the statute, finds himself still subject to serious fire hazards, greatly lessened if the township or several sections about him are correspondingly cleared. Cooperation, because of fire hazards, aids him in the same way that it helps the owner attempting private drainage or irrigation. To the settlers in the cut-over lands fire is a common enemy as is water to the owners of wet and overflowed lands. The importance and legal propriety of enforced cooperation is not fanciful. It has found serious judicial expression. Thus in Fallbrook Irrigation Dist. v. Bradley, 164 U. S. 112, 163, 17 Sup. Ct. 56, 65, 41 L. ed. 369, the court said:

"If it be essential or material for the prosperity of the community, and if the improvement be one in which all the land owners have to a certain extent a common interest, and the improvement cannot be accomplished without the concurrence of all or nearly all of such owners by reason of the peculiar natural condition of the tract sought to be reclaimed, then such reclamation may be made and the land rendered useful to all and at their joint expense. In such case the absolute right of each individual owner of land must yield to a certain extent or be modified by corresponding rights on the part of other owners for what is declared upon the whole to be for the public benefit."

A similar statement of the situation is made in Bemis v. Guirl Drainage Co. 182 Ind. 36, 45, 105 N. E. 496, 499:

"The application of the police power to the formation of drainage and reclamation districts is on the theory that parcels of land may be so situated toward each other as to create a mutual dependence and a natural community which will justify a compulsory joint improvement; and that the exercise of the police power consists in applying to this community the same principle of majority rule

which is recognized as a matter of course, for local purposes in neighborhoods constituting political subdivisions. The primary benefit flows always to all parcels of lands involved, while a distinct public benefit other than an economic one to the particular district concerned may or may not be involved."

A likeness between the proceeding before us and a proceeding under the restricted residence district statute, Laws 1915, p. 180, c. 128, may be noted. Under that statute it is held that apartment buildings, thought objectionable, may be excluded from a restricted residence district established by a city council under legislative authority. State v. Houghton, 144 Minn. 1, 13-21, 177 N. W. 885, 176 N. W. 159, 8 A. L. R. 585. There is so much of a public use in keeping a residential district free of apartment houses, to the end, in part at least, that residents may the better enjoy their private homes, that the exercise of eminent domain with a consequent assessment of benefits and damages sufficient to carry the burden of restriction is justified. There it was said [at page 16]:

"The notion of what is public use changes from time to time. Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities."

The principle was stated in a different form in Central Lumber Co. v. City of Waseca, 152 Minn. 201, 202, 188 N. W. 275:

"Economic and industrial conditions are not stable. Times change. * * * The constitutional provision that taxes can be levied only for public purposes remains; but conditions which go to make a purpose public change."

The Houghton case is not parallel in its facts with the case at bar; but it illustrates one species of community of interest and interdependence of people and property which, in the judgment of this court, justified, in the language of the Indiana case, "a compulsory joint improvement;" or which, in the language of the Fallbrook case, required the absolute right of each individual owner to "yield to a certain extent or be modified by corresponding rights on the

part of other owners for what is declared upon the whole to be for the public benefit."

Counsel for the defendants does not claim that the legislature may authorize a county to finance the clearing of land of settlers, just to aid in opening them for profitable agriculture, any more than it can build homes for urban or rural landowners, so that they may have comfortable habitations which they cannot themselves now provide. The legislature has not thought to do so. It has been held, under a Constitution granting appropriate power, that the legislature may authorize something akin to this. Green v. Frazier, 253 U. S. 233, 40 Sup. Ct. 499, 64 L. ed. 878; Green v. Frazier, 44 N. D. 395, 176 N. W. 11.

The opinion deprecates the trend of legislation toward paternalism. It says that this statute is strictly paternal and entirely private; that its utter futility in preventing forest fires is too apparent for serious consideration; and that the suggestion of forest fire protection is in the statute to supply a possible public purpose.

It may be noted, as the trial court noted, that the statute is not "constitutional because it is good public policy, in the opinion of the court, nor is it unconstitutional because it is bad public policy, in the opinion of the court." The question of policy is for the legislature. The individual or collective views of members of the court on the policy of valid statutes—their views decrying or favoring paternalistic or cooperative legislation—carry no additional weight because they constitute a court to which has been delegated the duty of holding statutes unconstitutional if they do not keep within constitutional grants or limitations.

The holding that the plan of the statute is of utter futility and that provisions referring to fire protection are made a part of it to supply a possible public purpose does not appeal to me as correct. The legislature had better knowledge of conditions than the court. It made an investigation; the court did not. It was its duty to determine the policy of the state, the workability of the statute, the futility or feasibility of the plan, whether carried out it would conduce to fire protection, and other relevant factors; those duties the court does not share—constitutionally cannot. The legislature

presumably discharged its constitutional obligations; it is a wiser body for legislation than the court; and anyway the Constitution put the obligation there. A late writer on constitutional questions, whose views carry weight, put it this way:

"The legislature in determining what shall be done, what it is reasonable to do, does not divide its duty with the judges, nor must it conform to their conception of what is prudent or reasonable legislation. The judicial function is merely that of fixing the outside border of reasonable legislative action, the boundary beyond which the taxing power, the power of eminent domain, police power, and legislative power in general, cannot go without violating the prohibitions of the constitution or crossing the line of its grants.

"It must indeed be studiously remembered, in judicially applying such a test as this of what a legislature may reasonably think, that virtue, sense, and competent knowledge are always to be attributed to that body." Thayer, Leg. Essays, 27, 28.

The majority opinion refers to the rural credits constitutional amendment proposed by the 1921 legislature and adopted at the 1922 election. Laws 1921, p. 999, c. 528. Legislation under it is promised. If the statute is unconstitutional it was so when enacted. The constitutional amendment does not affect it. Nor will legislation under it subserve the purpose intended by the statute. Lending money will not accomplish its object any more than it will obviate the necessity of drainage laws if there is to be effective drainage. The argument fails to take account of the necessity of enforced community cooperation against a common peril.

The constitutionality of the statute is for the court. In State v. Houghton, 144 Minn. 1, 174 N. W. 885, 176 N. W. 159, 8 A. L. R. 585, cited before, and in other cases, considerable weight is given to the view of the legislature in enacting the statute. But this must not be stressed too much. Ultimately the question is for the court which is the constitutional interpreter of the Constitution as of all laws. If constitutional government continues courts must insist that the power to define a public use is cast upon them as a duty which they may not surrender to a coordinate branch of the

government. If the statute wants a genuine public use the court should say so, without equivocation, as the majority opinion does.

In determining the constitutionality of the act consideration is given the situation presented in the cut-over districts; the interdependence of the settlers and their lands because of forest fire hazards; the difficulties besetting the individual who clears his land while other lands similarly situated are left wholly uncleared and a continual invitation to fires; and the practical necessity of compulsory cooperation. The fire hazards incident to the cut-over regions present such a difficulty of enjoyment and use that there arises a community of interest and interdependence among the owners and their lands that the state may authorize a compulsory joint improvement. It should be in mind that the making of wet lands available for agriculture furnishes a public purpose sustaining enforced drainage or irrigation. The legislature deems the scheme practicable. It takes the responsibility of the ultimate workability of the plan. I cannot see that the plan of fire protection is futile, or that the legislature inserted fire protection features to make a possible public purpose. It thought the fire situation made a public purpose. The means provided reasonably tend to accomplish the object in view and were devised in good faith. The proceeding is new in instance. That does not condemn it. It is only for the court to say whether the statute is bottomed upon a legitimate public use. For the reason that it appears to me that it is I am unable to concur in the prevailing opinion.

HALLAM, J. (dissenting.)

I dissent.

It seems to me we will do well to bear in mind that only constitutional questions are here involved and to confine our opinion to their consideration. The suggestion that legislation under the recently adopted Rural Credits Amendment to the Constitution will meet every purpose intended to be consummated by the statute in question, may advise wise legislative policy, but in my opinion it has no bearing on the constitutional questions involved.

Nor does it help much in determining this constitutional question, to characterize this legislation as of "extreme paternalistic character", finding a counterpart only in the legislation of North Dakota. The law was passed by a unanimous vote of the Minnesota Senate, an almost unanimous vote of the House, and received the approval of the Governor of the state. While it is not important to the constitutional questions involved, still I find nothing to indicate that the 1921 lawmakers intended, with such unanimity, to appropriate the economic program of a sister state.

The majority opinion, in effect, and the syllabus in express words, states that this statute is void as a violation of article 9, §§ 5, 10, of the Constitution. Never before have those sections been considered to prohibit counties, towns, cities or villages from carrying on work of internal improvement or from loaning their credit for that purpose. This court has held that these local municipalities are not so prohibited, nor is the state from so authorizing them. Davidson v. County Commrs. of Ramsey County, 18 Minn. 432 (482); Cooke v. Iverson, 108 Minn. 388, 397, 122 N. W. 251, 52 L. R. A. (N. S.) 415. In the Davidson case it was held that such a municipality may even spend money raised by taxes for building of railroads. Judge Mitchell's opinion in Rippe v. Becker related only to the scope of activities of the state. The same improvement there considered, the building of a public grain elevator, was soon thereafter held a public purpose for which land might be taken under authority of the legislature, by right of eminent domain. Stewart v. Great Northern Ry. Co. 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427.

It may not be vital from a constitutional standpoint, but it is a fact that the cost of the improvement authorized by the act is borne ultimately, not by the county but by the property benefited.

For my part, I see in this act only an honest legislative purpose to deal with the combined problem of dealing with forest fires and the utilization of cut-over areas of unutilized land. This purpose is declared by the express terms of the act, namely, "the prevention of forest fires and the improvement and preparation of land—for agricultural purposes" by removal of growths "which contributes to

the danger of forest fires" and prevent the use of the land for agriculture. In view of the tremendous havoc done to life and property by conflagrations year by year in the past, this declared purpose of the act is surely a public purpose. In fact, the mere reclamation of large tracts of waste land has been held by the United States Supreme Court such a purpose as will sustain a general improvement plan, O'Neill v. Leamer, 239 U. S. 244, 36 Sup. Ct. 54, 60 L. ed. 249. Unless we can say that the substance of the act is an evasion of its declared purpose, the act is constitutional. We do not stand sponsor for its legislative wisdom. With that we have nothing to do, but, in my opinion, a reading of the act permits us to give the lawmakers credit for legislative candor in an intent to really carry out the purpose which they expressed.